J. H. LYONS, RESPONDENT, v. ST. JOSEPH BELT RAILWAY COMPANY, APPELLANT.—84 S. W. (2d) 933.

Kansas City Court of Appeals, September 15, 1937.

*Randolph & Randolph* and *Niles L. Vermillion* for respondent.

*Brown, Douglas & Brown* for appellant.

REYNOLDS, C.—On September 1, 1933, plaintiff filed his petition in the circuit court of Buchanan county, seeking the recovery from defendant of actual and punitive damages. The petition was in two counts, the first of which is based upon the alleged and unlawful refusal and failure of defendant to give plaintiff a service letter, in violation of Section 4588, Revised Statutes 1929; and said first count sought the recovery of $2,448.00 actual and $10,000.-00 punitive damages. The second count is based upon the alleged wrongful discharge of plaintiff by defendant from its service as an engineman, without cause and in violation and breach of a certain contract and also sought the recovery of $2,448.00 actual and $10,000.00 punitive damages. In each count, the acts complained of by plaintiff were alleged to have been wrongful, malicious, wanton, willful, without legal justification or excuse on defendant's part, and to have been induced by malice, spite, and ill will on the part of defendant toward plaintiff.

The defendant is engaged in the business of operating a switch or terminal railroad in the city of St. Joseph, Missouri. After admitting its corporate capacity and plaintiff's former employment

by it, as alleged in each count of the petition, the defendant made general denial of all other allegations of the petition and of each count thereof.

Upon a trial before the jury at the January, 1934, term of the court, verdicts were returned for plaintiff for one dollar actual damages upon each count and for $10,000 punitive damages upon the first count, upon which verdicts judgment was rendered for plaintiff in accordance therewith.

Thereafter, within the required time and at the same term of court, defendant filed motions for a new trial and in arrest of judgment.

Upon consideration of the motions for new trial and in arrest of judgment, the court directed a *remittitur*, which was made; and the amount of the judgment was reduced in said sum; and final judgment as reduced and corrected was entered for $1.00 actual damages upon each count and for $4,000 punitive damages on the first count; and the motions for new trial and in arrest of judgment were overruled. From such judgment as finally entered, the defendant appealed.

There is evidence tending to show that plaintiff entered defendant's service September 8, 1902, as a roundhouseman; that he was soon thereafter promoted to be a fireman, then to be a roundhouse foreman, then in October, 1907, to be an engineer, from which time he continuously remained in defendant's service until June 13, 1932, when he was discharged by one Lawrenson, at that time roundhouse foreman and master mechanic for defendant, having authority to employ and discharge men in the service as enginemen. At or about the time of his discharge, he asked for a service letter and was told by Lawrenson that he would have to wait until his checks came in. When he returned for his checks, he was asked by Lawrenson if he wanted a letter, to which plaintiff replied, "Yes, if there is a letter there I want it." Thereupon, Lawrenson wrote the following letter and delivered it to plaintiff, stating to plaintiff at the time that he was acting under orders from higher up.

"St. Joseph Belt Railway Company
"South St. Joseph, Mo.

"June 13, 1932.

"To Whom Concerned:

"J. H. Lyons entered the service of the St. Joseph Belt Ry. Co. of St. Joseph, Mo. on Sept. 8, 1902, as Round House Man; dismissed from the service of this company June 13, 1932, working as locomotive fireman. Service unsatisfactory.

"W. H. Lawrenson."

The evidence tends to show that the plaintiff, being dissatisfied with such letter, called upon A. C. Van Vliet, supervisor of de-

fendant's railroad, activities, and affairs, and made complaint to him concerning the same, in an attempt to secure from defendant a proper letter and to ascertain the cause of his discharge. Van Vliet stated to him that he had all that he was going to get. Plaintiff, in turn, applied to one R. E. Hastings, the ranking executive officer actively in charge of defendant's business. He was sent from first one to the other and back again for a period of about one year. Hastings told plaintiff he would not override his inferior officers. The result was that the only letter that he was able to get was the letter written by Lawrenson. Lawrenson never held the position of superintendent or general manager of defendant corporation and had never, prior thereto, written a service letter for an engineman; nor did he know much about such duties. After his discharge, the plaintiff sought new employment, making numerous applications therefor, but was unable to obtain any. In some instances, he exhibited the letter which Lawrenson had given him. He afterwards returned to Van Vliet and asked him for a proper service letter, so that he might get a job, and one that would clarify what the cause of his discharge was. Van Vliet refused to give one.

There was evidence tending to show that in October, 1929, the defendant (hereinafter sometimes referred to as the Belt) and the Union Terminal Railway Company (hereinafter called the Union Terminal), both engaged in the operation of switch and terminal railroads at St. Joseph, came under the common ownership of the Allegheney Corporation, controlled by the Van Swearingens; and, as a means of economy in operation, the management and the operation of both roads were consolidated under one and the same management. About August 1, 1930, Hastings, vice president and ranking executive officer of the Union Terminal, and Van Vliet, vice president and general manager of the same, took charge of the affairs of the defendant. As vice president and general manager of the Union Terminal, Van Vliet's duties spread over the defendant until he was made general yard master and supervisor of both roads, J. O. Barclay, Superintendent, and L. R. Sack, manager, of defendant at the time of the consolidation, being retired. Lawrenson, who had been roundhouse foreman for defendant until the time of the consolidation, became master mechanic and mechanical superintendent under the new management; was placed in charge of all engine employees (including the plaintiff) working on both properties; and was given the authority to employ and discharge enginemen as well as supervise their duties. In July, 1930, the defendant posted a notice in its yards to the effect that the management of the Union Terminal would thereafter supervise defendant's operations. It would appear that, prior to the time of the consolida-

tion of the management and operations of the two roads, the Union Terminal had made an agreement with the Brotherhood of Locomotive Firemen and Enginemen as to wages, rules, and working conditions to apply to the employment of its engineers and firemen, which was in force at the time of the consolidation and which continued in force up to and after the time of plaintiff's discharge. It does not appear that the two corporations were ever consolidated as such.

It appears that, for over twenty years preceding his discharge, the plaintiff acted as member of the grievance committee, representing the enginemen, employees of defendant, in their dealings with their employer. In this capacity, he had, in 1928, negotiated with defendant a working agreement governing the enginemen. Plaintiff remained a member of this grievance committee subsequent to the consolidation; and, in September, 1930, this grievance committee agreed with the defendant, through its supervisor, Van Vliet, to adopt for and in behalf of the enginemen in the employment of the defendant the contract theretofore in force on the Union Terminal property between the Union Terminal and its Brotherhood of Locomotive Firemen and Enginemen. Copies of this contract were furnished to each of the defendant's men, and each man signed for his copy upon delivery thereof to him. This contract contained, among others, the following provisions:

"Article 16—Seniority and Assignments.

"(a) Rights to regularly assigned runs or jobs shall be governed by seniority in the service.

"Article 18—Discipline and Representation.

"(a) No engineer or fireman shall be discharged, suspended or have a notation placed against his record without just or sufficient cause. When an engineer or fireman is charged with an offense which should warrant his suspension or discharge, if sustained, no suspension or discharge shall be inflicted (except suspension pending investigation) without a thorough investigation within five (5) days before the official having jurisdiction, at which he may have an engineer or fireman of his choice assist him in the investigation, who will be permitted to examine witnesses. He or his representative shall be furnished with a copy of the evidence brought out at such investigation, which will be the basis for discipline administered. When an engineer or fireman is called for investigation he shall be notified in advance for what purpose he is called.

"(b) If the engineer or fireman is not satisfied with the result of the investigation, he shall have the right to appeal his case through the General Chairman to the General Manager. In case discharge or suspension is subsequently found to be unjust, he shall

be reinstated, and, if a regular engineer or fireman, be paid for all time he would have made on his engine or run, during the period of suspension or discharge; if an extra man, he will be paid for time lost at rate of service last engaged in. If the notation against his record is decided to be unjust, it will be eliminated. When a notation is entered against an engineer's or fireman's record, he will be furnished a copy and will receipt for it.

"Article 21—Agreement.

"(c) All subordinate officers and enginemen shall be provided with copies of these rules and a copy shall also be kept in the engine house."

There is no evidence that this contract was ever terminated. At the time that it was adopted, plaintiff's name appeared thereon as Number 5 on the seniority list. It would appear that, on November 8, 1930, the plaintiff, as chairman of his grievance committee, entered into a further agreement with the Union Terminal employees for a division of the work and an assignment of crews on the two properties according to certain percentages, which was presented to Van Vliet as supervisor and manager of defendant and accepted by him for the defendant.

There was evidence tending to show plaintiff's competency and ability as an engineer and a fireman. Indeed, this seems to have been conceded by the defendant. There is no evidence tending to show that his services as such engineer or fireman were ever unsatisfactory in any manner or that any charge had ever been made against him. It would appear that, after the consolidation of the operations of the two properties and the adoption of the working agreement of the Union Terminal by the enginemen of the defendant, there were frequent complaints by the defendant's enginemen to the effect that they were not getting their fair share of the work under the agreements. Plaintiff was a member and, for the most time, the chairman of the grievance committee of the enginemen of the defendant, until about January 1, 1931. After such time, it seems that he, with the other members of his committee, were still relied upon by the defendant's enginemen to look after the application of the division of the working agreement with a view to protecting their share in the work. In doing this, plaintiff necessarily made many inquiries and had frequent discussions with different persons interested. It is contended by plaintiff that he never in doing so, in any way, neglected his duties during working hours; but it is contended by defendant that he did; that he would absent himself at times from his engine and talk with other enginemen in the yards while on duty; and that he frequently had to be sent after to go back to his work. However, this may be, any conflicts

582

in the evidence in such regard were determined by the jury in favor of the plaintiff.

The evidence tends to show that, in January, 1932, for the first time since he had been in defendant's service, plaintiff was called by Van Vliet into his office and there threatened by him with discharge if he did not "keep his mouth shut". When asked what the charge against plaintiff was or in what manner plaintiff had offended, Van Vliet refused to state but said that, if he heard anything more, whether true or not, plaintiff would be discharged. It appears from plaintiff's evidence that he refused to tell him what he had heard. Thereafter, without further notice, on June 13, 1932, plaintiff was advised by Lawrenson that he was discharged. A few days later, on plaintiff's return for his time checks, upon the same being delivered to him, the service letter hereinbefore mentioned was written by Lawrenson and delivered to plaintiff. Plaintiff thereafter made repeated attempts to learn the true cause of his discharge and in what particular his services had been unsatisfactory, not from Lawrenson alone but also from Van Vliet, the yardmaster and general supervisor of the defendant, and from Hastings, the ranking executive officer actively in charge of the defendant's business. None of them approached seemed to take any interest in plaintiff's behalf in the matter. Van Vliet informed him that he had all that he was going to get; that the cause of his discharge was as stated in the letter; and that that was all there was to it. Hastings told him he would not override his inferior officers. Lawrenson told him he was acting under orders from higher up; that he was being discharged for unsatisfactory service; that that was the cause; and that that was all there was to it. No particular charge seems ever to have been made by defendant against plaintiff, and no hearing or investigation of the general charge made was ever given him. No other letter was ever given him than that given him by Lawrenson. Van Vliet, in his evidence stated that defendant's enginemen, after the consolidation, were working under the same contract that the Union Terminal enginemen had with the Union Terminal and that there had been an agreement between him and the Belt enginemen that they should work under that contract. It would appear from the evidence that, about the same time that plaintiff was discharged, the other two members serving on the grievance committee with him for a number of years prior to that time were also discharged. Van Vliet, in his testimony, stated that the fact that plaintiff was a member of the grievance committee for the defendant's enginemen or that he was making investigations as a committeeman was not distasteful but that the manner in which he handled those duties was what he did not like.

There was evidence tending to show that ill feeling existed upon the part of Van Vliet and Lawrenson toward plaintiff prior to his discharge and that Van Vliet told plaintiff that he hated him; and Lawrenson testified that, if he had had the chance, he would have "fired" plaintiff long before and that he resented the fact that plaintiff had, in some way, belittled him. Van Vliet, in his testimony, stated that Lawrenson, before he discharged the plaintiff, conversed with him about it and asked him if he should discharge him and that he told him, "Yes." It would appear from the evidence that about January 1, 1931, subsequent to the consolidation, a new grievance committee, purporting to be a joint committee of all of the enginemen of both the Union Terminal and the defendant, was caused to be selected, from which committee plaintiff and his committeemen, Meade and Walker, were excluded and with which the enginemen of defendant were dissatisfied, which committee they refused to recognize. It also appears that such enginemen petitioned the plaintiff, Meade, and Walker to continue as their representatives and to take up such matters as that of adherence to the agreement for the division of work. Almost simultaneously with the continued work of plaintiff, Meade, and Walker as committeemen, the plaintiff was discharged and Meade and Walker were soon afterward. Van Vliet admitted upon the witness stand that he had never given plaintiff a hearing, stating to the effect that there was nothing in the contract requiring such. Soon after the plaintiff's discharge, defendant employed new men. After the consolidation, plaintiff received pay checks from both the Union Terminal and the defendant for work assigned by each and performed by him to the time of his dismissal.

The contract between the Union Terminal and the Brotherhood of Locomotive Firemen and Enginemen, in force at the time of the consolidation, after the consolidation was agreed between defendant through Van Vliet as its supervisor and its firemen and enginemen to be the contract under which they should work; and they thereafter worked thereunder.

At the close of plaintiff's evidence, the defendant requested instructions in the nature of demurrers directing verdicts for the defendant upon both counts of the petition, which were by the court refused. Again, at the close of the whole evidence, it requested instructions of the same nature, which were again by the court refused; and the cause was submitted to the jury.

OPINION.

Upon this appeal, defendant assigns error as follows:

"First: The court in refusing the instruction in the nature of a demurrer to the evidence as to both counts of plaintiff's petition,

offered at the close of the plaintiff's case, and again offered in the form of instruction marked 'A', at the close of all' the evidence in the case.

"Second: The court erred in denying the instruction in the nature of a demurrer to the evidence as to the first count of plaintiff's petition, offered at the close of plaintiff's case and renewed in an instruction marked 'B', at the close of all the evidence in the case.

"Third: The court erred in submitting the question of punitive damages to the jury as to the first count of plaintiff's petition.

"Fourth: The court erred in giving plaintiff's instruction numbered two, over the objections and exceptions of the defendant, and in instructing the jury therein that the matter of awarding punitive damages was entirely in the uncontrolled discretion of the jury.

"Fifth: The only instructions requested and given on behalf of plaintiff are abstract declarations of law, and the court erred in permitting the case to go to the jury without an instruction upon plaintiff's theory of the case.

"Sixth: The verdict of the jury awarding ten thousand dollars damages on the first count of plaintiff's petition is so outrageously excessive as to conclusively indicate prejudice and passion on the part of the jury, and this miscarriage of justice is not corrected by the *remittitur* of six thousand dollars, required by the trial court, without which the court announced the motion for a new trial would be granted, on the ground that the verdict was excessive.

"Seventh: The court erred in rendering judgment against the defendant for four thousand dollars in punitive damages on the first count of the petition after the *remittitur* entered by the plaintiff, and the judgment in favor of the plaintiff in that reduced amount is outrageously excessive.

"Eighth: The court erred in admitting in evidence, over the objections and exceptions of the defendant, the working agreement between the Brotherhood and Union Terminal Railway Company.

"Ninth: The court erred in refusing the instruction in the nature of a demurrer to the evidence as to the second count of plaintiff's petition, offered at the close of plaintiff's case and renewed in an instruction marked 'C' at the close of all the evidence in the case.

"Tenth: Under the undisputed evidence plaintiff was estopped to complain of his discharge by his failure to request a hearing in accordance with the provisions of the working conditions of employment by the Union Terminal Railway Company, and the court erred in refusing instruction 'C' requested by the defendant, and in refusing to submit that defense to the jury.

"Eleventh: The court erred in refusing instructions 'E' and 'F' requested by the defendant."

1. The first point made by defendant is that, upon the first count of the petition, plaintiff had the burden of proving that the service letter which he obtained did not satisfy the requirements of Section 4588, Revised Statutes 1929; that he requested a letter of the character which the statute prescribed; that defendant's superintendent or manager intentionally refused such request; and that plaintiff had failed to make such showing. The statute in question is as follows:

"Whenever any employe of any corporation doing business in his state shall be discharged or voluntarily quit the service of such corporation, it shall be the duty of the superintendent or manager of said corporation, upon the request of such employe (if such employe shall have been in the service of said corporation for a period of at least ninety days), to issue to such employe a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employe to such corporation and the duration thereof, and truly stating for what cause, if any, such employe has quit such service; and, if any such superintendent or manager shall fail or refuse to issue such letter to such employe, such superintendent or manager shall be deemed guilty of a misdemeanor, and shall be punished by a fine in any sum not exceeding five hundred dollars, or by imprisonment in the county jail for a period not exceeding one year, or by both such fine and imprisonment."

2. It is contended by defendant first that the statute in question (Section 4588) is penal in character. That it is penal in character may be conceded. It has been so determined by this court in the case of Soule v. St. Joseph Ry., Light, Heat & Power Co., 220 Mo. App. 497, 274 S. W. 517.

3. It may be conceded also that it is to be strictly construed (Lynch v. Missouri-Kansas-Texas Ry. Co. (Mo.), 61 S. W. (2d) 918) and that it is incumbent on plaintiff to bring himself within its terms in order to recover. [Cummins v. Kansas City Public Service Co. (Mo.), 66 S. W. (2d) 920.]

Defendant contends further that, in order to bring himself within its terms, it is incumbent on plaintiff to make at least a *prima facie* showing of a request to and a refusal by a superintending officer of defendant whose duty it is to issue service letters under such section; that there is no evidence that the plaintiff ever asked any superintending officer of the defendant for such a letter; that he accepted a letter written by one Lawrenson, master mechanic and superintendent of engine operation of the Union Terminal; that he never thereafter made any request for any different letter except to one Van Vliet, the yard master of the Union Terminal, who had no control or supervision over the plaintiff; and that the request

586

so made to Van Vliet was merely for the assignment of a cause for his discharge different from that given in the letter written by Lawrenson.

This section of the statute (Section 4588) has been construed by this court in the case of Soule v. St. Joseph Ry., Light, Heat & Power Co., supra, in which it was held that such section makes no specific requirement regarding the person of whom the request shall be made for a letter but merely specifies an officer or officers of the corporation whose duty it shall be to issue the same. Opinions from foreign courts cited by defendant in its brief upon this point are not, on this point, persuasive.

4. There is sufficient evidence to show that plaintiff made request for a letter under the statute and that the defendant, through those in charge of its railroad and its activities with superintending and supervisory control and management, knew of such request and caused the letter purporting to be the letter required by such section to be written by Lawrenson and delivered by him to the plaintiff.

In October, 1929, the Allegheny Corporation, controlled by the Van Swearingens, acquired the stock of both the Union Terminal and of the defendant. It does not appear that the two corporations were ever consolidated as such but the operations of the two roads were caused by the Allegheny Corporation to be consolidated under the management and supervision of the same officials. Van Vliet had formerly been one of the vice presidents and formerly had been manager of the Union Terminal and was such vice president and manager at the time of the consolidation of the two companies. Hastings had formerly been one of the vice presidents of the Union Terminal and was its ranking executive officer at the time of the consolidation. Upon the consolidation, both the duties of Hastings as vice president and ranking executive official of the Union Terminal and the duties of Van Vliet as vice president and manager of the Union Terminal were spread over and made to apply, not only to the operations of the Union Terminal but to the operation of the defendant railroad and so continued until April, 1932, when Van Vliet was made general yard master with general supervision over the operations of both the Union Terminal and the defendant and over their respective yards. In 1930, Hastings was elected to continue in his position as vice president with the Union Terminal and to take over the added duties as general agent for the defendant railroad. Prior to the consolidation, Lawrenson served as master mechanic for the defendant railroad. At the time of plaintiff's discharge, he was serving as mechanical superintendent of both the Union Terminal and the defendant with the title of master mechanic and had supervision over and direction of all enginemen and firemen

on both roads with authority both to employ and to discharge them. In July, 1932, at the time of plaintiff's discharge, there was no officer of either the Union Terminal or the defendant designated as superintendent or manager or bearing the title of superintendent or manager. The only executive officer remaining with the defendant corporation who had been connected with the defendant corporation prior to the consolidation was Topping, its president. At the time of plaintiff's discharge or soon thereafter, he made the request for a service letter, which resulted in the letter given him by Lawrenson. There is evidence to the effect that Van Vliet advised the issuance of the letter by Lawrenson and afterward advised the plaintiff, when appealed to by plaintiff concerning the deficiencies therein, to see Lawrenson about any changes he desired. There is evidence that plaintiff advised both Van Vliet and Hastings of his dissatisfaction with the Lawrenson letter and made request of Van Vliet to issue him a proper letter instead; that Van Vliet declined to do so; and that, when Lawrenson gave the letter to plaintiff, Lawrenson stated that he was acting under orders from higher up. Hastings, when approached by plaintiff, stated that he would not override his inferiors in the matter and failed to see that a proper letter was given him. It is obvious that the Lawrenson letter fails to meet the statutory requirements. It is shown that plaintiff had been in the service of defendant for a period of twenty years and over. It was defendant's duty to cause to be given to plaintiff, by its superintendent or manager or other officer or employee competent therefor within the contemplation of the statute, a letter setting forth the nature and character of the services rendered by plaintiff to it and the duration thereof, truly stating the cause, if any, why he was discharged. [Cheek v. Prudenial Ins. Co. of America (Mo.), 192 S. W. 387.] It was the duty of the defendant, acting through its superintendent or other proper officer, to give such letter. [Cheek v. Prudential Ins. Co. of America, supra.]

5. The defendant was not relieved of this duty by reason of the mere fact that it had no officer at the time designated as superintendent or manager. It was required to have a proper officer to comply with the requirements of the statute. The statute cannot be side-stepped in such manner. Defendant, in fact, had in charge of its railroad and its activities officers and employees who were discharging the duties of a superintendent or a manager. "That which we call a rose by any other name would smell as sweet." The evidence clearly shows that Hastings was the general agent of the defendant in its management and operation and had the general charge and supervision thereof. It likewise shows that Van Vliet had general supervisory control over its operations; that both managed its business activities and affairs; and that such letter could

have been issued through either of them, if Lawrenson himself was incompetent therefor, or perhaps through Topping, its president. Hastings was general agent for the road; and notice to him of plaintiff's request for a letter was notice to defendant, as also was notice to Van Vliet and to Lawrenson notice to defendant of plaintiff's demand for a letter. It was the duty of the defendant to have caused letter embodying the matters specified in the statute, signed by some proper person within the contemplation of the statute, to have been issued. [Cheek v. Prudential Ins. Co. of America, *supra.*]

6. The law presumes actual damage to plaintiff from the failure of defendant to issue a proper service letter as required by the statute. There is ample evidence justifying the submission for actual damages of the cause on the first count of the petition.

7. There is sufficient evidence also to authorize the submission of the cause as to the actual damages on the second count of the petition.

It is contended by defendant that it. did not have any contract with the plaintiff or other enginemen and could discharge plaintiff at any time. However, such contention is not borne out by the record. The evidence discloses that the contract in force between the Union Terminal and the Brotherhood of Locomotive Firemen and Enginemen at the time of the consolidation was thereafter agreed to between Van Vliet for the defendant (who, at the time, was supervisor of defendant's road and its activities) and defendant's enginemen and firemen as the contract under which the plaintiff and its other engineers and firemen should work and that, in pursuance of the provisions of such contract, a copy of the same was delivered by the defendant to each of its engineers and firemen, including the plaintiff. The evidence further shows that plaintiff was working under such contract at the time of his discharge. Such contract protected the plaintiff against discharge without just or sufficient cause and from the notation of any charge against his record without just and sufficient cause. Furthermore, it protected him against discharge upon any charge made without notice being given him and without a thorough investigation thereof within five days after it was made, in which he was to be permitted to participate. The evidence shows that the plaintiff was discharged without notice and without an investigation or an opportunity therefor being given him and, not only so, but that he was denied the particulars of the cause for which he was discharged. It was not necessary that plaintiff should have asked for a hearing, either before or after his discharge. Further, the facts in this case are such that he had no opportunity to ask for a hearing before his discharge, in as much as he had no notice of any charge against him prior to his discharge. It was incumbent upon defendant both to notify plaintiff of the charge and

to make the investigation before discharging him. The defendant clearly breached its contract with the plaintiff.

8. Moreover, it was not contended by defendant that the plaintiff was not a competent engineer and fireman or that he did not render efficient services as such; but, upon the other hand, it admitted that he was competent and that he did render efficient service. The most that defendant's evidence tends to show was a dissatisfaction by defendant with plaintiff's activities as a member of the grievance committee of defendant's engineers and firemen. It was contended by defendant that, in prosecuting such work, the plaintiff neglected his duties as engineer or as fireman; that, upon occasions, it was frequently necessary to send for him to bring him back to his work, which was being delayed by his absence; and that he constantly stirred up strife and dissatisfaction among the engineers and firemen. However, the evidence of plaintiff and his witnesses was to the contrary and tends to show that his duties as committeeman were prosecuted at times when he was not on duty as engineer or fireman for the defendant and that he did not engage in stirring up strife and dissatisfaction among the engineers and firemen. All conflict in the evidence in such regard was determined by the jury in plaintiff's favor, and it must therefore be held that no just cause is shown by the evidence for plaintiff's discharge. There is no evidence of any admission by the plaintiff that he was ever guilty of a violation of defendant's rules or of any neglect of service or of any wrongful conduct of any character to justify his discharge. The plaintiff denied throughout that he was guilty of any such conduct. Whether plaintiff had neglected his service or been guilty of a violation of defendant's rules or of any wrongful conduct in his employment was, under the evidence, a question for the jury. [Piper v. Wayne Mfg. Co. (Mo. App.), 253 S. W. 437.]

9. The defendant contends further that the contract in question, as entered into, must be treated as indeterminate in character and terminable by either party at any time without liability to the other. It has been held by this court in the case of McCoy v. St. Joseph Belt Railway (Mo. App.), 77 S. W. (2d) 175, that, notwithstanding such a contract may be indeterminate as to duration, it is nevertheless enforceable according to its terms so long as it is in force between the parties. This being true, it follows that the defendant could not, so long as plaintiff continued to work under the contract or so long as it continued to accept his services thereunder, discharge him in a manner contrary to the provisions set out therein. It is further held in the McCoy Case that contracts of the character involved herein are not, by reason of their indeterminate character, to be held unenforceable as a matter of law but whether such are enforceable must be made to depend on the facts and cir-

cumstances of each particular case. Defendant's contention therefore that it had under the contract, if made, a right to discharge the plaintiff without notice and investigation is not well made. There is sufficient evidence to show that the contract was entered into by defendant through Van Vliet (its supervisor) and the representatives of defendant's enginemen and firemen and that the same was accepted by such enginemen and firemen. It was therefore binding and enforceable as long as it remained in force and work was being done and accepted thereunder.

10. It is further contended by the defendant, with respect to the submission of the cause upon the first count for punitive damages, that there is no evidence that Lawrenson or any other managing officer in charge of the property on which plaintiff was employed intentionally or deliberately failed or refused to give plaintiff a service letter technically correct in every respect. We cannot agree with such contention. The record is pregnant with evidence that there was a determination, not only upon Lawrenson's part but upon the parts of Van Vliet and Hastings, to give plaintiff the letter delivered to him and no other. This letter is not signed by Lawrenson in any official capacity. It does not give the length of time that plaintiff worked for defendant or the kind of work performed by him or the length of time given by him to the different kinds of work performed by him. It does not state the cause for which he was discharged but merely states in a general way that his services were unsatisfactory and fails in any respect to give the particulars in which they were unsatisfactory. Lawrenson said he was giving the letter under orders from higher up. When plaintiff went to those higher up, he was told that he had all he was going to get, that the letter stated that his services were unsatisfactory, and that was all there was to it. Hastings told him he would not override his inferior officers. When Lawrenson was questioned by plaintiff as to the particulars of the unsatisfactory features of his services, Lawrenson likewise said that the letter stated that his services were unsatisfactory and that was all that he was going to get.

This plaintiff was entitled to a letter which conforms to the statute. The defendant openly refused to give it, without just cause and excuse so far as disclosed by the evidence. The conclusion cannot be escaped, under the evidence, that it knew it was wronging the plaintiff in refusing such letter and that in the Lawrenson letter he was not getting that to which he was entitled under the statute.

11. It is contended that Lawrenson thought that he was giving a letter technically correct; that Lawrenson, by reason of his inexperience and ignorance in such matters, did the best he knew; that he acted in good faith; and that there is no evidence to the contrary.

We cannot agree to such contention. There is evidence from which it may be found to the contrary. Lawrenson was not acting primarily in his own behalf or upon his own initiative. He was acting upon orders from the defendant through "higher-ups" and was no doubt advised just what form the letter should take. In any event, when complained to by plaintiff and asked for the particulars of the charge against him, Lawrenson contented himself with the statement that he was acting under orders from those above him and refused to particularize. Neither can we agree that Van Vliet and Hastings acted in good faith in the matter and in ignorance of any further duty toward plaintiff than that discharged by the Lawrenson letter. The evidence is highly suggestive that the Lawrenson letter and the failure to give plaintiff a proper letter in its stead were the results of a preconcerted understanding and arrangement upon the part of defendant and those acting in its behalf to compel plaintiff to take the Lawrenson letter or none, regardless of his rights and regardless of the statute. Under the evidence, it is merely begging the question to contend that the refusal to give a proper letter was the result of inexperience upon defendant's part or upon the part of any one acting for it in the matter. There is ample evidence from which the contrary may reasonably be inferred and also that it was not only not the result of ignorance upon Lawrenson's part or upon the part of others but was the result of a fixed and determined purpose upon the parts of Lawrenson and those directing him. If it had been the result of inexperience and ignorance upon Lawrenson's part, that could have been readily remedied by Van Vliet and Hastings, when appealed to by plaintiff, had they so desired. There is sufficient evidence from which the inference is to be drawn that defendant, in giving plaintiff the letter complained of and in failing and refusing to give him a proper service letter, acted intentionally, wrongfully, wantonly, and maliciously, without just cause and excuse, denoting malice in law. Malice in law is the intentional doing of a wrongful act without just cause or excuse. [Hall v. St. Louis & San Francisco Ry. Co. (Mo. App.), 28 S. W. (2d) 687.] There was also evidence of malice in fact, of hatred and ill will. The evidence therefore justifies the submission of punitive damages under the first count of the petition.

Defendant's demurrers to each count of the petition were correctly ruled and properly refused by the trial court.

12. The defendant complains that the court gave no instruction in plaintiff's behalf telling the jury what facts, if found by it, would be sufficient to authorize a finding in plaintiff's behalf on the first count of his petition or what facts, if found by it, would justify the assessment of punitive damages for a wrongful act intentionally done the plaintiff in the matter of the alleged refusal of the proper service

letter and that, in submitting the cause without such instructions on plaintiff's part, it committed error.

It complains also of instruction Number 2, given in behalf of plaintiff, as affirmatively misdirecting the jury, such instruction being as follows:

"The jury are instructed that in law there are two kinds of malice, actual malice and legal malice. By actual malice is meant actual spite and ill will. By legal malice is meant the intentional doing of a wrongful act without just cause or excuse.

"The jury are further instructed that the matter of awarding punitive damages is entirely within the discretion of the jury and you cannot award punitive damages on the first count of plaintiff's petition unless you find and award actual damages on said count."

It was held by the Supreme Court in the case of Dorman v. East St. Louis Railway Company (Mo.), 75 S. W. (2d) 854, that it is the duty of the court to require of the plaintiff in any case to submit an instruction informing the jury what facts, if proven, would warrant a verdict in his favor; that it is just as much the inherent duty of the court to see to it that the jury be informed as to the law of the case as it is that competent evidence be adduced supporting the facts necessary to constitute a cause of action; that a failure in such respect constitutes at least *prima facie* error; and that, where prejudice results to the losing party by reason of the court's failure so to do, the judgment should, upon appeal, be reversed and the cause remanded for retrial, where defendant has properly saved the point and is in a position to press it.

The defendant properly saved its exceptions to the giving of plaintiff's instruction Number 2, complained of. It failed, however, to make any objection or to save any exception at the trial to the action of the court in failing to require the plaintiff to submit more detailed instructions or to the action of the court in submitting the cause without more detailed instructions setting forth the theory of plaintiff's case and the facts which, if found by the jury, would entitle plaintiff to recover. The first complaint made of the action of the court with respect to such submission is found in the motion for a new trial. This was not sufficient to preserve the point as such for review upon this appeal. [Young v. Wheelock, 64 S. W. (2d) 950; McCoy v. St. Joseph Belt Ry. Co., supra.]

The defendant complains of instruction Number 2 given for plaintiff on account of the omission therefrom of any directions to the jury as to the facts to be found by it authorizing the assessment of punitive damages in its discretion or of any information as to the law on plaintiff's theory of the case and on account of an alleged affirmative misdirection therein to the jury to the effect that it was authorized in its discretion to award plaintiff punitive damages

against the defendant upon the mere finding for plaintiff of actual damages against him, without regard to malice or intentional wrong upon the part of the defendant in doing the act complained of. However, when instruction Number 2 for plaintiff is read in connection with instruction Number 3 for plaintiff (which latter instruction advised the jury that punitive damages were such as might be assessed for plaintiff for the act complained of when wrongfully or maliciously done), the jury could not have been misled by instruction Number 2 into believing that it was authorized thereby to exercise its discretion upon merely finding that the defendant failed or refused to give a proper service letter and upon the mere finding of actual damages for plaintiff against the defendant on account of such failure or refusal. It was advised by instruction Number 3 that such failure or refusal, if found, not only must have been a wrongful act but must have been one maliciously done. The jury was advised by instruction Number 2 that an act maliciously done was a wrongful act done through actual spite and ill will or one intentionally done without just cause or excuse. When the two instructions are read together, which they must be, the alleged misdirection that might otherwise appear in instruction Number 2 standing alone and the omissions therefrom in the particulars complained of disappear. [Markowitz v. Kansas City, 125 Mo. 485, 28 S. W. 642; Meadows v. Pacific Mutual Life Ins. Co. of California, 129 Mo. 76, 31 S. W. 578; Brown v. Globe Printing Co., 213 Mo. 611, 112 S. W. 462.]

13. Moreover, it appears that defendant requested and obtained instructions I, J, K, and L covering the whole case, by which the jury was fully informed as to the burden of proof and the facts necessary to be found by it before the plaintiff could recover and before a verdict could be returned against the defendant. The defendant was therefore not prejudiced by the failure of the court to require full instructions upon the plaintiff's part. The jury ascertained from the instructions given the full theory of plaintiff's case and the facts necessary to be proven, upon which his right of recovery was predicated as well as the full theory of defense. The jury was told in one of the instructions that all of the instructions were the instructions of the court. The instructions were therefore all of equal standing before the jury, unprejudiced by the fact that the one or the other may have been requested by the plaintiff or by the defendant. Error without prejudice is no ground for reversal. [Dorman v. East St. Louis Ry. Co., supra; Brandon v. Carter, 119 Mo. 572, 24 S. W. 1035; State ex rel. Hospes v. Branch, 151 Mo. 622, 52 S. W. 390; Shinn v. United Rys. Co., 248 Mo. 173, 154 S. W. 103.]

14. It is true that, where an erroneous instruction is given for plaintiff, the vice therein, if one of misdirection, is not cured by the giving of a proper instruction for the defendant conflicting therewith.

[State ex rel. State Highway Commission v. Blobeck Inv. Co. (Mo. App.), 63 S. W. (2d) 448; Patterson v. Evans, 254 Mo. 293, 162 S. W. 179; State ex rel. Central Coal & Coke Co. v. Ellison, 270 Mo. 645, 195 S. W. 722.]

There is, however, as found, no real vice of misdirection in plaintiff's instruction Number 2 when read in connection with its accompanying instruction Number 3; neither did it undertake to direct a verdict; and there is no conflict between said instructions when construed together and no conflict between said instructions when so construed and the instructions asked and obtained by the defendant upon the trial. All of said instructions when read together fully and properly present the law of the case. Mere generality and incompleteness in an instruction may be cured by other instructions, which supply the omissions therefrom without conflict therewith.

15. There was no error in the refusal by the court of defendant's requested instructions E, F, and G or of any of them. None of them were properly based upon the record of each omitted essential features of the proven facts, and each wholly ignored important facts shown by the record. Instruction G was based in part upon matters not shown by the record and upon matters contradictory of facts shown by the record.

16. No error was committed by the trial court in admitting in evidence the working agreement between the Brotherhood of Locomotive Firemen and Enginemen and the Union Terminal. It is sufficiently shown by the evidence that the agreement as such was adopted in this case as the working agreement between defendant and its enginemen by the authorized representatives of defendant and the authorized representatives of its Brotherhood of Locomotive Firemen and Enginemen and accepted by such enginemen as well as by defendant's representatives for it.

17. There is no merit in defendant's contention that plaintiff was estopped to complain of his discharge by defendant by reason of his failure to request a hearing. It was not incumbent upon plaintiff, under the evidence, to request a hearing; but it was incumbent upon defendant to give him one before discharging him. Besides, if it had been plaintiff's duty so to have done, he was given no opportunity to do so. He was discharged by defendant without notice and without any knowledge that there was a charge against him that might be investigated.

18. We come now to the consideration of defendant's complaints respecting the amount of the jury's verdict and the overruling of defendant's motion for a new trial upon a remittitur entered thereon reducing such verdict. Defendant contends, first, that there is no evidence upon which the jury might find punitive damages, upon proper instructions and in the absence of misdirections contained in

instruction Number 3 for plaintiff. The contentions thus advanced have been involved in the discussion already made herein, where they have been disposed of adversely to defendant. They are again ruled against defendant. There was sufficient evidence upon which the jury might find punitive damages, and there was no misdirection of the jury which resulted in prejudice to the defendant. Defendant contends, second, that the verdict of the jury in the award of punitive damages was grossly excessive under the evidence and so out of proportion to the actual damages as to indicate a disregard of the evidence by the jury; that it can be accounted for only on the theory of passion and prejudice by the jury; and that the court abused its discretion in failing to set aside said verdict as a whole and permitting a *remittitur;* that the amount of the verdict alone requires a reversal of the judgment entered below. We cannot agree with such contention. In Sperry v. Hurd, 267 Mo. 628, 185 S. W. 170, it was said in regard to punitive damages, ". . . a hard-and-fast rule for the measuring of such damages cannot be declared. Each case turns more or less upon its own peculiar facts. The character and standing of the parties, the malice with which the act was done, and the financial condition of the defendant are elements which should be taken into consideration in awarding damages of this character [Buckley v. Knapp, 45 Mo. 152; 8 R. C. L. 606-608, secs. 151, 152, and cases therein cited; 2 Sutherland on Damages (3 Ed.), p. 1092], and the amount may be such as would by way of punishment and example serve to deter the occurrence of like acts in the future." The jury thus has considerable range in respect to the amount of the verdict in any particular case, according to the facts in the record thereof. The record in this case discloses both legal and actual malice. The defendant is a large railroad corporation employing many men. The record does not disclose its financial worth in terms, but the conclusion is inescapable that an ordinary award of punitive damages only would have but little determent effect upon it. The jury doubtless took note of all of these matters in arriving at the amount of its verdict; as well as of the act committed, the nature thereof, all the circumstances surrounding its commission, and all other matters shown by the record. There is nothing in the record from which it appears that it was acting under any improper influences or impelled by any improper motive in assessing the amount of the punitive damages at $10,000. The verdict was doubtless the result of the honest judgment of the jurors upon the facts in the record. That it was excessive may be true, but not so much as to suggest to the judicial mind that the jury was actuated by a disregard of the evidence or by bias and prejudice or by any improper motives or that it was acting under any improper influence. It is true that a verdict may be so large and out of all reason or so contrary to the evidence as to amount to misbehavior on the part of the jury and should

therefore not be permitted to stand. [Van Loon v. St. Joseph Ry., Light, Heat & Power Co., 174 Mo. App. 372, 160 S. W. 63; Burdict v. Missouri Pacific Railroad Co., 123 Mo. 221, 27 S. W. 453; Partello v. Missouri Pacific Railroad Co., 217 Mo. 645, 117 S. W. 1138.] Or it may be so excessive as to strike the judicial mind as being the result of bias or prejudice or misconduct on the part of the jury; and, in such case, a new trial would be the only cure. [Chitty v. St. Louis I. M. & S. R. Co., 148 Mo. 64, 49 S. W. 868; Burdict v. Missouri Pacific Railroad Co., supra.] We fail, however, to find such a situation in this case.

While it may be true that ordinarily a verdict for punitive damages should not be altogether disproportionate to the amount of actual damages returned, yet, in this case, the verdict for actual damages of one dollar only was returned under the instructions of the court, for the reason of plaintiff's inability to introduce competent evidence of greater damages; and therefore the actual damages assessed furnish no proper guide for the amount of the punitive damages to be returned. Especially is this so as there is ample evidence in the record justifying a liberal award of punitive damages, and the inferences therefrom should not be limited and restricted by an arbitrary assessment of actual damages. It is true that the trial court reduced the amount of the verdict by $6000, doubtless upon the theory that it was excessive. It is not to be imputed, however, to the trial court that the *remittitur* was allowed because it appeared to it that the verdict as returned was so excessive as to indicate bias and prejudice on the part of the jury or that it was the result of improper motives upon the part of the jury or of improper influence over it. If it had so appeared, it is not to be presumed that the court would have permitted a *remittitur;* but it is to be presumed that the court would have set the verdict aside and granted a new trial. From a review of the evidence in the record, we are convinced that the judgment of the court below is fully supported thereby.

We find nothing from which the proper exercise of discretion upon the part of the trial court or the judge thereof, in the matters of permitting the *remittitur*, overruling the motion for new trial, and entering final judgment upon the verdict for the amount thereof less the amount of the *remittitur*, is to be impeached. Whatever may be the rule in other jurisdictions, the rule in this state is that *remittiturs* are allowable in cases involving punitive damages, as well as in those involving actual damages. [Sperry v. Hurd, supra.]

We have sufficiently disposed of all errors assigned and points made by defendant. The judgment of the trial court should be affirmed. It is accordingly so ordered. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of REYNOLDS, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.