Stephen W. NEWTON, Plaintiff,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant.**

No. 81–1208C(C).

United States District Court,
E. D. Missouri, E. D.

May 11, 1982.

Hale W. Brown, Kirkwood, Mo., for plaintiff.

Joseph Kortenhof, St. Louis, Mo., for defendant.

## MEMORANDUM

MEREDITH, District Judge.

This matter is before the Court on defendant's motion for summary judgment. Plaintiff, a discharged employee, brought this action against defendant, his former employer, for alleged violation of § 290.140, RSMo. (1978), V.A.M.S., the so-called "service letter statute." Plaintiff is a citizen of the state of Missouri. Defendant is a corporation organized and existing under the laws of the state of Illinois with its principal place of business in the state of Illinois.[1] The amount in controversy, exclusive of interest and costs, exceeds the sum of ten thousand dollars. Jurisdiction is proper in this Court under 28 U.S.C. § 1332, diversity of citizenship.

Plaintiff's complaint is in two counts. Count I alleges that the service letter provided to plaintiff by defendant failed to state the true reason for plaintiff's discharge and was not sufficiently specific as to those reasons, as required by the service letter statute. Count II seeks recovery against defendant for libel.

There is no issue as to the material facts in this case. Plaintiff was employed by defendant insurance company from November 29, 1971 until May 6, 1981. Plaintiff was employed by defendant in Missouri. At the time of his discharge, plaintiff held the position of service field claims adjuster.

Before Christmas, 1980, plaintiff approached Pat Carmody, a superintendent for defendant insurance company, to obtain some diamonds which were held in salvage by the company. Mr. Carmody was in charge of the safe where the diamonds were stored. Plaintiff indicated that he wanted to acquire the diamonds to mount in a ring, and suggested that he had received permission to do so from James Politte, a claims supervisor.

Plaintiff took the diamonds to Frank Vinciquerra, a local gemologist who often purchased damaged diamond stones from defendant company, for an appraisal. Plaintiff suggested to Mr. Vinciquerra that he put a token price on the diamonds and that plaintiff would then buy them from him. Plaintiff then purchased a ring mounting for the stones from Hess and Culbertson, a jeweler. Vinciquerra subsequently informed plaintiff that the stones were worth $155.00. Vinciquerra gave plaintiff four checks payable to defendant for the stones, and plaintiff paid Vinciquerra $155.00 for the same stones. Plaintiff next took the stones to Hess and Culbertson to be set in the mounting he had purchased there. The total cost to plaintiff of the ring, including mounting, mounting fee, and stones, was less than $700.00.

Although the ring was already covered by plaintiff's home owner's policy, plaintiff attempted to obtain additional coverage on it through defendant insurance company. Plaintiff contacted Thomas Richardson, a State Farm agent in St. Charles, Missouri for this purpose. Plaintiff informed Richardson that the ring contained salvage diamonds from State Farm and had cost him anywhere from $600.00 to $1000.00. (Plain-

---

1. Plaintiff was, technically, discharged by State Farm Casualty Company and not State Farm Mutual Automobile Insurance Company, defendant herein. These entities are both subsidiaries of State Farm Insurance Companies. Each of these entities, and their parent corporation, are incorporated in Illinois and have their principal place of business in Illinois. They share offices in Bloomington, Illinois and have a common legal department. The distinctions between them are rather fluid, and defendant has not contested plaintiff's decision to proceed against this particular subsidiary. The Court will therefore treat this action as if the correct corporate entity had been named.

tiff arrived at this higher figure by including the "time and trouble" he put into the ring.) However, he wanted to insure the ring for $8000.00 based on the replacement cost for undamaged stones. Plaintiff submitted a premium check for insurance on the ring based on $8000.00 in coverage.

Plaintiff admitted knowledge that this amount of coverage would be a source of concern at defendant's home office if the true value of the ring were known. Plaintiff further admitted that he knew of no other State Farm employees who had purchased salvage stones in this manner. Although employees were not prohibited from purchasing salvage items, the normal procedure was to submit sealed bids for the items, which were approved or disapproved by a supervisor. James Politte, plaintiff's supervisor, denies that plaintiff ever spoke with him concerning purchase of the stones. Despite a request by Mr. Carmody, plaintiff never submitted the necessary bids.

After plaintiff's application for insurance on the ring was received by defendant, defendant sent an investigator, Chuck R. Liddil, to inquire into the matter. Plaintiff initially refused to make a recorded statement, and resisted requests to have the ring appraised again. Mr. Liddil subsequently interviewed Mr. Vinciquerra; Juanita Stock, the woman with whom plaintiff had dealt at Hess and Culbertson; and Pat Carmody. On April 14, 1981 plaintiff consented to an interview with Mr. Liddil in the presence of James Politte. The results of the investigation were transmitted telephonically to State Farm Deputy Regional Vice-President Cliff Custin on April 15, 1981, who decided to discharge plaintiff from defendant's employ.

On May 6, 1981, plaintiff was told that he had the choice of resigning or being discharged. He was informed that he could no longer work for defendant due to his "integrity" in dealing with the salvage diamonds. Plaintiff thereafter contacted a State Farm deputy vice-president, Don Duggins, who told him he was terminated because of bad judgment in connection with the diamonds.

By letter dated May 7, 1981, plaintiff requested Harold Hull, a State Farm manager, to provide him with a service letter stating the reasons for his discharge. On May 15, 1981, Charles C. Lindquist, State Farm's regional personnel manager, sent plaintiff the following letter in response to his request:

TO WHOM IT MAY CONCERN:

Stephen .W. Newton was employed by the State Farm Insurance Companies from November 29, 1971 until May 6, 1981. During that tenure, Mr. Newton handled automobile claims in the State Farm Automobile Insurance Company, was an underwriter in the State Farm Fire and Casualty Company, and, finally, handled claims in the State Farm Fire and Casualty Company.

Mr. Newton was terminated by the Companies due to improprieties in the handling of company salvage.

This letter complies with the requirements of the Missouri service letter statute, which states that the letter must set forth: (1) the nature and character of the service rendered by the employee, (2) the duration of such service, and (3) the true cause, if any, for the termination of the employment. Plaintiff has not contested that items (1) and (2) have been satisfied. As for item (3), there is no doubt that plaintiff was, in fact, terminated because of the manner in which he acquired the salvage stones and his attempt to insure them at an inflated value. All of the affidavits and exhibits support this conclusion, and plaintiff has effectively conceded as much. Nothing in the record supports the contention that plaintiff's handling of the salvage diamonds was used merely as a pretext for terminating him. Given this, plaintiff has not, as a matter of law, established a submissible case under the service letter statute. *Newman v. Greater Kansas City Baptist and Comm. Hosp. Ass'n*, 604 S.W.2d 619, 622 (Mo.App. 1980); *Terranova v. Western Auto*, 589 S.W.2d 362, 363 (Mo.App.1979).

■■ Although there is no genuine issue in this case that plaintiff was terminated

because of the salvage diamonds, plaintiff nevertheless argues that the letter is deficient in that it does not state the reasons for his termination with sufficient specificity. Missouri courts have held that generalities do not fulfill the requirements nor meet the standards of the service letter statute. *Williams v. Kansas City Transit, Inc.*, 339 S.W.2d 792, 799 (Mo.1960); *Walker v. St. Joseph Belt Ry. Co.*, 102 S.W.2d 718, 723–24 (Mo.App.1937). For example, letters have been found deficient where no reason at all was given for termination, *Walker v. St. Joseph Belt Ry. Co., supra*; where the reason given was simply "unsatisfactory service," *Lyons v. St. Joseph Belt Ry. Co.*, 232 Mo.App. 575, 84 S.W.2d 933 (Mo.App.1935); and where the letter states that the employee had failed to do such things as effectively carry out his supervisor's instructions, cooperate properly with his supervisors, and "maintain acceptable working relations with some of the personnel with whom [he] dealt," *Cumby v. Farmland Industries, Inc.*, 524 S.W.2d 132, 136 (Mo.App.1975).

This requirement of specificity is necessary in order to effectuate the purpose of the statute, which was originally enacted to protect union employees who were discharged on some pretext in retaliation for collective bargaining activity. By requiring a correct statement of the true reasons for termination, the statute helps to insure, *inter alia*, that capable employees are not "blacklisted" or otherwise hindered in finding future employment for reasons wholly unrelated to their actual job performance. *See Cheek v. Prudential Ins. Co.*, 192 S.W. 387, 392 (Mo.1917).

This purpose of the statute was not frustrated by the letter issued by defendant in this case. The letter here indicated that there was a specific problem, handling of company salvage, which clearly reflected on plaintiff's fitness in handling his duties as a claims adjuster. That such a problem actually existed is unquestioned. The letter, which is much more detailed than those involved in the cases quoted above, does not unfairly brand plaintiff for acts which have no basis in fact. The letter therefore comports with both the letter and the spirit of the statute. There being no genuine issue of material fact in this matter, summary judgment will accordingly be entered in favor of defendant and against plaintiff on Count I of plaintiff's complaint.

Plaintiff's response to defendant's motion for summary judgment concedes that Count II of the complaint is without merit and requests that Count II be dismissed. Accordingly, the Court shall order that Count II of the complaint be dismissed with prejudice.