DALLAS M. HATTON, RESPONDENT, v. CARDER WHOLESALE GROCERY COMPANY, APPELLANT.—150 S. W. (2d) 1096.

Kansas City Court of Appeals. May 5, 1941.

*Groves & Watkins* and *O. W. Watkins, Jr.* for appellant.

*Sherman & Sherman* for respondent.

BLAND, J.—This is an action in two counts. The first count is for the recovery of damages for the refusal of defendant to furnish to plaintiff a service letter, upon the termination of his employment with it, as provided by Section 5064, Revised Statutes 1939. The second count is to recover the balance due plaintiff as wages. There was a verdict and judgment, on the first count, in favor of plaintiff in the sum of $1 actual and $5000 punitive damages and, on the second count, in the sum of $31.78, with an appendage attached thereto reading as follows: "We also recommend that the Carder Wholesale Grocery Company furnish Dallas M. Hatton with a proper service letter." Defendant has appealed.

The facts show that defendant is a corporation engaged in the wholesale grocery business in the City of St. Joseph; that plaintiff was employed by the defendant as one of its truck drivers who delivered goods for it and made collections for the price of the same upon delivery; that plaintiff, on April 6, 1940; left the employ of the defendant as the result of a controversy between him and it as to whether he had accounted for the sum of $36.92. This sum he had collected, on March 8, 1940, from the Trading Post, one of defendant's customers, to which plaintiff had delivered a bill of groceries.

The evidence shows that the collection in question was described as a C.O.D. The practise of the defendant relative to C.O.D. sales was as follows: Tickets were made by the shipping clerk on the return of the driver from his trip. These tickets were made in triplicate sheets or slips, one copy being white, the other pink, and the third, yellow. The tickets were bound together in a book and were taken by the driver to the cashier, who took them to an adding machine to add them up. The cashier would then receive the money from the driver and the former would stamp all of the sheets paid. The white copy was retained by the cashier for posting in the books. The pink copy was handed to the driver as his receipt and the yellow one remained in the book as an office record.

Plaintiff made the collection from the Trading Post on March 8, 1940, and on March 14, he took the C.O.D. tickets to Mr. Brislin, the cashier, who marked the sheets paid.

The evidence of the defendant tended to show that the cashier did not receive this item from plaintiff and made a mistake in marking the slips paid. The cashier, testifying for the defendant, stated: "I just count the number of C.O.D. items that appear on the tape and if there are, say ten on the tape, I run through and stamp the pink C.O.D.'s there. . . . I check it (the cash) with the adding machine tape." He excused his mistake by saying that he

was very busy that day and that "in running down these tapes, I simply miscounted those tapes. I had fifteen or twenty C.O.D.'s and I just counted down with my eye the number of C.O.D.'s that appear on the tape and I just simply miscounted more, one more than was actually on the tape." He further testified that he never had the white sheet or slip and that it was not in defendant's records.

Plaintiff testified that he paid the sum of $36.92 at the time he received the receipt from the cashier on March 14, 1940; that about two weeks prior to April 6, 1940, the cashier told him that he could not find where plaintiff had "turned in" the money and "wanted me to make it up;" that the witness told the cashier that he had "turned all my money into him and I would know when I got home and looked up my receipts;" that the cashier said for him to see Mr. Bostick, the auditor, credit and office manager of the defendant; that thereafter he saw Mr. Bostick, whom he told: "I didn't know anything about it and would have to look up my slips;" that Bostick told him that the cashier had made a mistake in stamping the tickets paid; that Mr. Bostick took him to the cashier's office and got out the adding machine tape, covering the day in question, and went over it with the witness; that afterwards the witness told Bostick that he had paid the items and did not want to pay them again and asked if arrangements could not be made so he could make small payments on the Trading Post item. He was asked: "Q. Did you make any arrangements with him to pay anything on it? A. Not exactly. No."

Plaintiff was paid by the week and, on March 30, 1940, defendant obtained $10 from his pay check to apply upon the account in question. Plaintiff testified that, during the following week after this, he saw Mr. Bostick and asked him to "see if they could cut the payments down," as the witness had "some bills pressing;" that Mr. Bostick referred him to Mr. Gaethle, the general manager of defendant; that on April 6, he saw Mr. Gaethle and told him that "they were going to take out another $10" and "I wasn't going to pay it;" that Gaethle said: "I had to pay it. If I didn't pay it over, why I wasn't going to work. Q. What did you do then? A. I quit and walked out. Q. Did you ask him for any letters or wages? A. I asked for a letter. Q. You asked for what? A. Service letter. Q. What did he tell you? A. He said no. Q. I didn't understand you. A. No. Q. What was his attitude? A. Well— Q. Did he display anger? A. He wasn't particularly—he wasn't angry."

On cross-examination he stated that he told Gaethle: "Well, I am not going to pay any more;" that Gaethle replied: "Well, Dallas, you will have to either pay it or else." A. That's what he said. Or else not work. Q. And that's all you said, wasn't it? A. Right then? Q. At that time. Yes. A. I told him I wasn't going to pay it and asked for a letter. Q. Did you ask for a letter then? A. Yes.

. . . Q. Well, I am asking what you said and what he said? A. I told him I wasn't going to pay it. Q. And then you turned and walked away? A. I turned and walked away. Q. You didn't tell him you were going to quit your job? A. I went to the checker who checks us out. Q. Who was that? A. The checker was Bob Lamar and told him;'' that he then went to see an old friend, who was a lawyer, and with his assistance, they wrote a letter addressed to the defendant asking it to give plaintiff a service letter, stating how long plaintiff had worked for defendant, the character of the work and why he was discharged or left defendant's service. He then called upon Mr. Gaethle accompanied by a deputy sheriff. These things all transpired the same day.

The deputy sheriff, testifying for plaintiff, stated that he and the plaintiff called upon Mr. Gaethle; that plaintiff hand Gaethle the letter stating that it was a written request for a service letter; that Gaethle refused to take it saying: ''He couldn't give him any service letter until the acount was straightened up. Q. What did Mr. Hatton say in response, if anything? A. Mr. Hatton asked for his wages and he said he wasn't going to give it to him until he paid the account. Q. In what manner or what was his tone of voice at the time he made those remarks to Mr. Hatton, just tell the jury? A. He was like—well business officials. He was kinda curt and to the point, kinda curt like, talked like a business official. I've seen a lot of them do the same way. Q. Did he give Mr. Hatton a service letter at that time? A. No, sir. He didn't. Q. He refused it? A. Yes, sir. Q. Did Mr. Hatton leave? A. Yes, sir.''

Plaintiff's testimony in reference to this second conversation with Mr. Gaethle is substantially the same as that of the deputy sheriff. He state that he handed Gaethel the letter but Gaethle would not read it and ''shoved it back to me;'' that Gaethle left the letter laying on the counter where it remained when plaintiff left.

Plaintiff further testified: ''Q. Now when you talked with Mr. Gaethle you called him Norman? A. Yes. Q. And you call him Norman now? A. Yes. Q. You have always been friendly with him? A. Yes. Q. And he is friendly with you now? A. Yes, and always has been. Q. He has always been and he had no malice toward you, no anger toward you, did he? A. No, only the last time I asked him for my letter. He was kinda mad then.''

Mr. Bostick testifying for the defendant stated; that several days after March 14, 1940, he discovered that defendant's books showed that the Trading Post account had not been paid and he attempted to collect the amount from that concern but was advised that it had paid the account; that he and the defendant's cashier, after making an examination of the records of the defendant concluded that plaintiff had not turned in the money; that he told plaintiff that he would have to make some arrangements for taking it out of his salary; that

plaintiff agreed and said he would pay the cashier that afternoon but failed to do so and came back the next morning with the receipt "and I sat down with him and went over the records, the listing, etc., and convinced him that the item had not been paid by him. Q. Then what did Mr. Hatton say? A. He said some arrangement could be made to take it out of his salary. . . . He agreed to ten dollars per week to be taken from his salary;" that plaintiff agreed to this after he and the witness had gone over the adding machine tape and the tickets in the cashier's office; that $10 was taken out of plaintiff's wages on March 30, and applied upon the item in question; that the second week plaintiff asked that the payments be reduced because he had several bills to pay and the witness referred plaintiff to Mr. Gaethle.

On cross-examination he testified: "We have never accused" plaintiff of "embezzlement;" that plaintiff was bonded but the matter had never been turned over to the bond company.

Mr. Gaethle, testifying for defendant, stated that, after Mr. Bostick had talked to him about the Trading Post item he told plaintiff that the records showed that he had not turned in the item and that "we would expect him to pay it. Q. What did he say then? A. He did not object to it. I told him we would take out ten dollars a week; that we wanted to make it as easy as possible. I realized his circumstances. We have always been friendly. I have been friends with all the employees;" that "he didn't say that he would or that he wouldn't pay it;" that the witness talked with the cashier and told him to take $10 per week from plaintiff's salary until the account was paid; that this conversation took place a day or two before the first pay day after March 14th; that he had another conversation with the plaintiff on April 6th, when plaintiff came to his desk and said: "They are going to take another ten dollars out of my check. I don't owe it and I am not going to pay it . . . I got up from my desk and Dallas (plaintiff) and I both walked down the aisle in the office to the radiator in front of the cashier's cage. While we were standing there Dallas said, 'Well, I am not going to pay it; and I said, 'Well, Dallas, I haven't a thing against you, but you will have to pay it or else.' That's the exact words I said. Q. What did he say? A. He didn't say a thing. He turned around and walked away. Q. Were you angry at Dallas at that time? A. Not then, nor now. Q. Did you bear any malice or ill will then or do you bear any now? A. I never have. Q. Did you discharge Dallas that morning? A. I did not. He discharged himself. Q. When is the first time you learned that he had left the employ of your company? I'd say thirty minutes later. My foreman came in and said Dallas had quit;" that plaintiff returned about 12:00 o'clock with the deputy sheriff; that plaintiff then said " 'I came back for my money.' I said, 'Dallas, you haven't any money coming.' That all that was said.

Q. Did he demand any service letter? A. He did not. Q. Did he hand you any letter at that time, hand you a letter demanding a service letter? A. He did not. Q. When was the first time Mr. Hatton wanted a service letter from the Carder Grocery Company? A. When we received notice of the suit, that was the first idea I had that he wanted a service letter. As a matter of fact, I didn't know what a service letter was until I received that notice.''

On cross-examination, he testified: ''Q. You said the second time when he came back, you told him he would have to leave it or else; that he would have leave ten dollars out of his check or else? A. Yes. Q. What did you mean by 'or else'? A. I meant he could either leave ten dollars or he would stop work. Q. In other words, he was fired if he didn't? A. That's right. Q. And he didn't so he was fired? A. He refused to make a delivery. His work was there but he walked off and left it.'' The witness further testified that he never had accused and was not now accusing plaintiff of embezzlement.

The suit was filed on April 11, 1940, five days after the last conversation between plaintiff and Mr. Gaethle.

Mr. Gaethle further testified: ''Q. Do you bear any ill will or any officer or employer in the Carder Grocery Company bear any malice or ill will towards the plaintiff, Dallas Hatton? A. No, sir. Q. How does he address you? A. Norman. Q. He calls you by your given name? A. Yes. Q. You are manager of the company? A. I am. All the employees address me the same way. Q. How do you call him? How do you address him? A. I call him Dallas. He has always been Dallas.''

Mr. Gaethle further testified that, on May 9, 1940, he went personally to the residence of the plaintiff and delivered to him a service letter dated May 8, 1940; that when he arrived at plaintiff's home and handed him the letter the latter stated: '' 'I am by myself. I am chief cook and bottle washer.' And I said 'Dallas, that's good experience for you.' That's all that was said.'' Plaintiff admitted receiving the letter and testified substantially as did Mr. Gaethle as to what was said at the time. So far as the record shows plaintiff never objected to this letter as not being a proper one. The letter, after reciting the nature and character of the service rendered by plaintiff to the defendant and the duration of his employment, stated: ''That in the latter part of March, 1940, a dispute occurred between the said Dallas Hatton and the undersigned company over the collection of an account due the undersigned from the Trading Post, which said account amounted to the sum of $36.92; that said dispute finally resulted in the statement of the said Dallas Hatton to the effect that he would not adjust said dispute in accordance with the direction of the management of the company, at which said time the said Dallas M. Hatton was told by the Manager of the undersigned Company that he must make said adjustment as directed, or terminate his employment

with the company, and that the said Dallas M. Hatton, thereupon, and on April 6, 1940, terminated his employment with the undersigned company by leaving the premises of the undersigned.''

The petition alleges that the act of the defendant, in refusing to give plaintiff a service letter, was ''Wrongful, willful, malicious and without legal justification or excuse, and the defendant's conduct in the premises aforesaid was actuated by malice, spite and ill will toward the plaintiff.''

Plaintiff's main instruction told the jury, in effect, that its verdict should not be in excess of $1 actual damages, but it and other instructions of plaintiff submitted to it the allowance, in its discretion, of punitive damages based upon malice. They permitted the jury to consider, in this connection, legal malice, that is ''the intentional doing of a wrongful act without just cause or excuse'' and actual malice, telling the jury that by the latter is meant ''actual spite and ill will.''

Defendant sought unsuccessfully to have the court withdraw from the consideration of the jury the question of actual malice and now assigns as erroneous the actions of the court in instructing the jury, on behalf of plaintiff, so as to permit it to consider spite and ill will on the part of the defendant, and refusing defendant's said instruction. In this connection defendant states that the record is barren of any evidence tending to show spite or ill will on the part of the defendant or its employees toward plaintiff. We are of the opinion that defendants' contentions are well made.

There is nothing in the conduct on the part of the defendant, or its agents, tending to show that they were actuated by spite or ill will. There is no evidence that they did so much as even to accuse plaintiff of embezzlement. The evidence tends to show that the matter was not even referred to the bonding company. Plaintiff, himself, admitted that the feeling between himself and Gaethle had always been friendly. Taking the evidence in its most favorable light to plaintiff, and putting the worst construction upon the evidence as to defendant's conduct, it shows that, when plaintiff requested the service letter of it, it made an improper condition to its giving and refused it when plaintiff would not comply with the condition; that Mr. Gaethele knew that plaintiff was entitled to it and refused it in order to bring pressure to bear upon plaintiff to pay the $36 92, which plaintiff did not owe. This conduct on the part of Mr. Gaethle was improper and justified the submission to the jury of the question of punitive damages based upon legal malice, that is, the intentional doing of a wrongful act without just cause or excuse. But it shows nothing further than that Gaethle attempted to collect the debt by unlawful means, the evidence showing that he had no feeling whatever against plaintiff in the matter. His sole motive was to collect the debt. While his conduct was reprehensible, it requires something more than this to authorize a judgment for punitive damages based upon spite and ill will. While

plaintiff is entitled to have all of the evidence on this point, and all reasonable inferences that may be drawn therefrom, considered in their most favorable light to him, the evidence must be substantial and a scintilla or modicum of evidence is not sufficient (Grange v. Chi. & E. I. Ry. Co., 69 S. W. (2d) 955), and the inferences must be reasonable and not forced. [Bushman v. Barlow, 292 S. W. 1039, 1049.]

We have examined the cases of Lyons v. St. Joseph Belt Ry. Co., 84 S. W. (2d) 933, and Walker v. St. Joseph Belt Ry. Co., 102 S. W. (2d) 718, cited by the plaintiff, and find that the facts in those cases are wholly unlike those in the case at bar, so far as relates to the question of actual malice.

Defendant also complains of the giving by the court of plaintiff's instructions 6 and 7, reading as follows:

"6. The Court instructs the jury that by the phrase 'preponderance of evidence' they are not to understand that the number of witnesses who may testify to any fact, affirmatively or negatively, will constitute a preponderance of evidence. But, in ascertaining the preponderance of evidence as to any fact, they are to look to all of the circumstances surrounding the transaction as shown by the evidence, consider the credibility of the witnesses, their bias or prejudice, their relationship to the parties, and all other things which tend to increase or diminish the value of their testimony."

"7. The Court instructs the jury that you are the sole judges of the credibility of the witnesses and of the weight and value to be given to their testimony, and in determining the weight to be given to any witness' testimony, the jury may take into consideration the interest, if any, that the witness may have in the results of the trial as shown by the evidence; his or her relationship, if any, to the parties in the suit, as shown by the evidence; the demeanor and conduct of the witness while upon the witness stand, and if you believe that any witness has wilfully sworn falsely to any material fact in issue in this case, then you are privileged to disregard or reject all or any part of such witness' testimony."

Under the authorities there was no error in the giving of plaintiff's Instruction No. 7. [Malone v. Frank, 247 S. W. 369; Eastman v. United Ry. Co. of St. Louis, 232 S. W. 725; Wright v. Kansas City, 187 Mo. 678, 689, 690, 695.]

The giving of two cautionary instructions has been criticized. [Williams v. Guyott, 126 S. W. (2d) 1137; Miller v. Williams, 76 S. W. (2d) 355.] However, we need not decide whether the giving of the two instructions on the subject of the credibility of the witnesses in this case constitutes reversible error. However, we think that plaintiff's Instruction No. 6 is clearly erroneous. Preponderance of the evidence is nowhere else referred to in the instructions. This might not be fatal, but we think the fact that the instruction assumes that there were witnesses who were biased and prejudiced constitutes

reversible error. [Reavis v. Gordon, 45 S. W. (2d) 99, 100; State ex rel. v. Williams, 69 S. W. (2d) 970; Rodefer v. Brooking, 206 Mo. App. 538, 544.] There is nothing in Instruction No. 7 to cure the error.

The defendant insists that the verdict shows upon its face that the jury considered facts outside the scope of the issues and, in this connection, defendant directs our attention to the appendage to the verdict, finding for plaintiff in the sum of $31.78, on the second count. The verdict on the two counts was evidently written on two separate sheets of paper, or, at any rate, they were separated on the same sheet, as each finding was headed by the style of the case. As bearing upon what the jury had in mind in making this unusual addition to its verdict, it should be stated that, at the request of the plaintiff, the court gave plaintiff's Instruction No. 4, which reads as follows:

"The Court instructs the jury that the fact that defendant issued delivered to the plaintiff after the institution of this suit the service letter offered in evidence does not constitute a defense to this action. And such fact can only be considered by you in mitigation of damages."

The offering of this instruction was a substantial concession by plaintiff that the letter was one that complied with the statute, though belatedly given him. Of course, the appendage to the verdict shows that the jury gave no consideration to the instruction.

Also, bearing on the subject we may state that, in arguing the case to the jury, counsel for plaintiff sought to minimize the effect of the giving of the service letter that Mr. Gaethle handed plaintiff on May 9, 1940, counsel saying that Gaethle was "then trying to cover it up. . . . They did write him a letter and Dallas took that letter, but could he take that letter and try to get a job on it any place? Yes, it says down there 'a dispute arose over $36.92.' Do you think he could get a job on that? Don't you think they would call up about it? They would call Mr. Gaethle, 'what's this dispute about $36.92?' Well, he kept $36.92 in money and lied about it.' "

Thereupon, counsel for defendant objected to this statement and asked that counsel be reprimanded and the jury discharged. The court refused to discharge the jury but admonished counsel for plaintiff to confine his admissions to the evidence. Defendant now seeks to have the judgment reversed on account of this incident. We need not pass upon the question as to whether the court committed reversible error in overruling the motion for a new trial in view of this incident, alone. However, it was not proper to argue, in effect, that the letter should have been such a one as to aid plaintiff in securing another job. Plaintiff's Instruction No. 4 substantially conceded that the letter complied with the statute and nowhere in the evidence is there shown any dispute about it. The argument may well have contributed to the action of the jury in appending to the verdict the matter in question. Counsel for plaintiff later stated to the jury:

"Then they took their time and they came along and gave him a service letter as outlined here, accusing the man indirectly of having $36.92 and based that conclusion upon the adding machine slip and the failure of their own cashier to have the white slip."

The jury found for plaintiff on the second count for the full amount of his wages. This was equivalent to a finding that he did not agree to the retention of $10 from his salary by defendant on March 30, 1940, and raises a strong inference that the jury believed that plaintiff had paid to the cashier the Trading Post item of $36.92. In order to return a verdict for plaintiff on the first count, it was unnecessary for the jury to find that he did not owe the Trading Post item but merely to conclude that defendant refused to give him a service letter upon the termination of his employment. The same situation is not present as to a finding for plaintiff on the second count and the fact that the appendage was made to that count is significant.

From all of these circumstances, we think that the only inference to be drawn concerning the action of the jury, when they stated in their verdict, in connection with the finding that defendant was indebted to plaintiff for all of the wages prayed for; "We also recommend that the Carder Grocery Company furnish Dallas M. Hatton with a proper service letter," is that they found that the service letter furnished was not a proper one in that it should have stated therein that plaintiff did not actually owe the Trading Post item. This, of course, shows that the jury paid no attention to the court's Instruction No. 4 on the subject of mitigation of damages. This conduct on the part of the jury is reflected in the very large verdict for punitive damages.

It has been held that ordinarily where a jury attempts to interpolate in a verdict matters of which it has no concern, the verdict is not void, and the interpolation should be regarded as merely surplusage. [Kimberlin v. Roberts, 107 S. W. 24; State ex rel. Webster v. Knight, 46 Mo. 83; Ranney v. Rader, 48 Mo. 539.] However, where the verdict shows that the jury has reasoned falsely the verdict is void. [67 C. J., p. 1085.] We think this latter is the situation here.

Defendant insists that the verdict for punitive damages is grossly excessive and, while we think it is large in amount, it is unnecessary for us to say that it is so large as to indicate bias, prejudice or corruption on the part of the jury. This for the reason that, on another trial of the case, the matter may not arise as no one can foretell what the recovery for punitive damages, if any, will be. So it would be useless to go into the matter at this time. [Davis v. F. M. Stamper Co., 148 S. W. (2d) 765, 772.]

Plaintiff's Instruction No. 1 should not have been given. While ordinarily there may be little practical difference between an employee

being discharged and quitting his master's service because the former does not care to continue his service under the conditions laid down for their continuance, it was not proper to characterize defendant's conduct as "discharging" or "dismissing" plaintiff, in view of the fact that malice and punitive damages were claimed.

The judgment is reversed and the cause remanded. All concur.