WILLIAM M. CHRISMAN, JR., RESPONDENT, v. TERMINAL RAILROAD ASSOCIATION OF SAINT LOUIS, APPELLANT.—157 S. W. (2d) 230.

St. Louis Court of Appeals. Opinion filed January 6, 1942.

Appellant's motion for rehearing overruled January 20, 1942.

Petition for writ of certiorari granted by Supreme Court March 10, 1942.

Writ of certiorari quashed by Supreme Court January 5, 1943.

Relator's motion for rehearing overruled by Supreme Court March 25, 1943.

182

*Carleton S. Hadley, Walter N. Davis* and *Arnot L. Sheppard* for appellant.

*Hay & Flanagan* for respondent.

HUGHES, P. J.—This is an action by respondent to recover from appellant both actual and punitive damages for an alleged violation of Section 5064 of the Revised Statutes of Missouri 1939, which reads as follows:

"Whenever any employee of any corporation doing business in his (*sic*) State shall be discharged or voluntarily quit the service of such corporation, it shall be the duty of the superintendent or manager of said corporation, upon the request of such employee (if such employee shall have been in the service of said corporation for a period of at least ninety days), to issue such employee a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee has quit such service; and if any such superintendent or manager shall fail or refuse to issue such letter to such employee when so requested by such employee, such superintendent or manager shall be deemed guilty of a misdemeanor, and shall be punished by a fine in any sum not exceeding five hundred dollars, or by imprisonment in the county jail for a period not exceeding one year, or by both such fine and imprisonment (R. S. 1929, Sec. 4588)."

Appellant's statement fairly presents the issues, and we adopt the same with minor corrections and such additional facts as are mentioned in the course of the opinion.

On November 18, 1938, respondent was and for more than fourteen years had been in appellant's employ as an usher or redcap at Union Station, St. Louis, Missouri. He had been continuously in its employ for more than ninety days next prior to November 18, 1938.

His duty as a redcap was to carry baggage for those members of the public who came to appellant's Union Station as passengers upon the trains of the various railroads which take on and discharge their passengers at that point. In addition to carrying baggage, the redcaps sometimes worked as gatemen, checking passengers' tickets as they passed through the gates to board trains; pushed sick people in wheel chairs furnished by appellant, and sometimes helped employees of appellant in picking up mail if a truck should turn over.

Respondent's working hours were from 7 o'clock A. M. to 9 o'clock A. M., and from 4 o'clock P. M. to 12:30 A. M. every other week, and from 7 o'clock A. M. to 9 o'clock A. M. and from 11 o'clock A. M. to 6 o'clock P. M. the other weeks.

The redcaps' remuneration for their services in handling baggage consists entirely of gratuities from the public. Originally they received nothing from appellant for their services as gatemen, but for the three or four years immediately preceding November 18, 1938, they were paid for acting as gatemen.

Over appellant's objections respondent was permitted to testify that the redcaps were "on seniority;" that "certain boys would get the front doors by their seniority." However, respondent's counsel admitted there was no special contract creating seniority rights.

Paul A. Dwyer, general chairman of the union's grievance board, admitted that on November 18, 1938, there was no special contract creating seniority rights as to redcaps. Actually the question of granting seniority rights to them was still under negotiations at the time of the trial of this cause, December 9, 1940, and was awaiting the result of another suit pending in the federal district court.

Over appellant's objections respondent was permitted to testify as to his union affiliations and activities. Originally respondent belonged to A. F. L., Local 20419; about eight days before he left appellant's services he joined the Brotherhood of Railroad and Steamship Clerks.

When he reported for work about 3:30 P. M. on November 18, 1938, he found a notice on a bulletin board that "the following men will return to service November 19, 1938, at 7 A. M.," and there was a line drawn beneath a list of nineteen men. The notice further said: "The following ushers will not report for service after midnight of this date, November 18, 1938." Under this second notice appeared the names of respondent, Cothern, Hopkins and Stuessel.

Cothern was not an officer of the Brotherhood of Railroad, etc., Clerks, but was a member and had been an officer in the previous A. F. L. union. The same was true of Hopkins. Stuessel had belonged, but had not been an officer of the A. F. L. union. About two weeks later Stuessel was returned to work.

Respondent went to Mr. Dwyer, who composed a letter alleged to be a request upon appellant to issue to respondent a letter in obedience to Section 5064, R. S. 1939, heretofore set out. Respondent, Hopkins, Cothern and Stuessel each copied Dwyer's letter and together went to the office of Mr. Perry, stationmaster and yardmaster, where respondent handed Mr. Perry his letter copied from Dwyer's. Perry read the letter, "turned around and beat the desk with his fist, and said, 'I haven't anything to say now or any time; I'll talk to your representatives, but I have nothing to say to you.'"

This letter which respondent handed to Mr. Perry "was a demand for a statement in writing why we were being dismissed from the service, demand for a letter from them." Respondent received no letter from appellant at that time; but a year, seven months and three days later he received a letter stating the reason for his dismissal, he says.

This letter is dated June 21, 1940, and is as follows:

"Terminal Railroad Association of St. Louis

Certificate of Service

Or

Service Letter.

Application No. 27757.
St. Louis, Missouri
June 21, 1940

"To Wm. Marshall Chrisman, Jr.,
or To Whom It May Concern:

"This is to certify that Wm. Chrisman, Jr., was last employed in the Stationmaster's Department of the Terminal Railroad Association of St. Louis in the capacity of Usher or Redcap on the 21st day of September, 1929, and that he was continuously in the service of said Terminal Railroad Association of St. Louis from said date in said capacity until the 18th day of November, 1938, except during those periods when on furlough or leave of absence.

"Wm. Marshall Chrisman, Jr., was previously employed by the Terminal Railroad Association as a baggage handler from April 17, 1924, until September 21, 1929.

"Following is certain descriptive information with respect to said persons:

"Age at time of issuance of letter—33 years. Weight 147. Height 5'10½". Color of eyes Blue. Color of Hair Brown. Complexion Light.

"The cause of said Wm. Marshall Chrisman, Jr., leaving the service of said Terminal Railroad Association is as follows: Dismissed because of reduction of force.

"J. M. Perry,
Stationmaster of Terminal Railroad
Association.

"J. A. Mathewson,
General Superintendent of Terminal
Railroad Association of St. Louis."

All evidence respecting any possible actual damages allegedly sustained by respondent is purposely omitted, because the trial court, on appellant's motion for a new trial, held it insufficient to sustain an award based upon actual damages, ordered a *remittitur* of all actual damages found by the jury except one dollar, and respondent entered such *remittitur*.

All of the nineteen men whose names appeared on the bulletin as having been ordered to report for work November 19, 1938, belonged to the union. One of them had been in appellant's employ only thirty days.

Respondent testified that he knew both appellant's superintendent and general superintendent; but he demanded a letter only from Mr. Perry, and not from the superintendent or the general superintendent. Over appellant's objections respondent was permitted to detail a conversation he had with appellant's general superintendent about two or three weeks subsequent to November 18, 1938. This testimony is as follows:

"A. I went in the outer office and Mr. Wicks was at the desk and he recognized me and told me to follow him and he walked through Mr. Davis' office and Mr. Mathewson's office, and I shook hands with both of them, and we sat down at the desk and I said, 'I understand you will tell me why I was fired if I called here in person?' and he said, 'Yes,' and I said, 'I have heard rumors floating around that I was a trouble maker and that is why I was fired, and if I am I would like to have your report where I caused any trouble,' and Mr. Mathewson said, 'We are not saying whether you was the trouble maker or not, but what you was fired for was your statement what you was going to do for the union, that you was going to do this and that, and a lot of other things, and you were going to get the boys all a large sum of money in back pay for the services they had rendered, and when you got this you would quit and go to your other job,' and I said, 'If I could quit and go to the other job I would go today, if you can fix it up for me, but this is impossible,' and I said, 'I was about thirty or thirty-five off of the extra board,' and I later wrote a letter and I was forty-five off of the board, and that goes by seniority strictly.

"Q. That is the fireman's job? A. Yes, sir; so I asked him, I says, 'Won't you consider my past record? I have been with you over fourteen years,' and I said, 'I never have had any trouble; you haven't any record;' I said, 'I have got all merits; I have got two demerits for breaking a piece of mail on your platform and I got cautioned to be a little more careful, and I have got about three hundred merits for good deeds,' and I said, 'Won't you give me another chance?' and they said, 'We won't give you a chance at anything,' and Wicks jumped up and said, 'If you cause any trouble over this we will see that you are fired off of that other job and you wouldn't want to lose a good job over this lousy one,' and I told him it would be advisable for him not try to interfere with that job."

Subsequently respondent's union took up with the National Railroad Adjustment Board the matter of his discharge. A hearing was held by that Board, as a result of which the Board refused to order appellant to reinstate respondent.

On November 18, 1938, Mr. Dwyer, the union's general chairman, wrote a letter to Mr. Perry requesting information "as to the cause of" respondent's dismissal. Four days later Dwyer wrote appellant's general superintendent, telling him that "four of the ushers" had requested Stationmaster Perry to "give them in writing the cause for their dismissal" and saying, further, "These men should be given a cause for their dismissal and a hearing at which time they would have an opportunity to disprove any complaints that might have been made against them."

To these communications appellant replied that while there had been no seniority rights established by respondent or any other redcap, the length of service had been taken into consideration when the men were recalled to work.

Evidence from other redcaps showed the membership in the two unions, and their demand from Mr. Perry for a letter stating the reason for their dismissal.

The financial statement of appellant as of December 31, 1939, showed current assets of $3,459,179.66; bonds to the extent of $46,000,000.00; a total investment of $72,167,851.26; a deficit of $1,074,999.53 in 1938 and a deficit of $83,343.48 in 1939.

Respondent's instructions submitted the hypotheses of respondent's employment by appellant, his discharge and his request for a letter "truly stating for what cause, if any, plaintiff had been dis-·charged." His instructions informed the jury further that it could find punitive damages based upon either actual or legal malice.

Appellant asked no instructions save its demurrer.

The jury found for respondent in the sum of $2,000 actual damages and $3,000 punitive damages. The trial court ordered a *remittitur* of $1,999 of the actual damage award. Respondent remitted this sum, leaving a final judgment of $3,001 against appellant, from which it has brought the case here on appeal.

Appellant contends that Section 5064, R. S. 1939, upon which this action is based, is a penal statute, and consequently should be strictly construed. A strict construction is one which limits the application of the statute by the words used. It places no greater burden on one party litigant than on the other; both must comply with the terms of the statute. And where a statute is expressed in plain and unambiguous terms, whether those terms are general or limited, the Legislature should be intended to mean what they have plainly expressed, and consequently in such case no room is left for construction. As to this section of law, insofar as it fixes a duty upon the corporation to issue a letter to a discharged employee upon his request, and what shall be set forth in the letter, requires no construction because the meaning is plainly expressed. Respondent, after being discharged on the 18th day of November, 1938, was entitled to such letter upon request made to the proper officer of the corporation. The section provides that the duty to issue the letter, when requested, is upon the superintendent or manager, and in this case respondent's request was made to J. M. Perry, who is designated officially by the defendant as "Stationmaster of Terminal Railroad Association." Was this a sufficient request?

Regardless of what title may have been conferred upon Mr. Perry by the corporation, if his duties were such that as to the ushers or redcaps employed by the defendant he would come under the category of the statutory words "superintendent or manager," he would be

a proper person to whom the employee could make his request for a letter. The statute does not require or mean that the request must be made to the person the corporation may choose to designate as superintendent or manager, but does mean that the request shall be made to the person who performs the duties of a superintendent or manager as to the work or department in which such employee is engaged. The corporation is privileged to confer any title it may choose, whether appropriate or not, to any of its officers, but by doing so it could not circumvent the plain meaning of this statute. It would be an absurd construction of the statute to say that the corporation could use some other official title than superintendent or manager for the official who performs the duties of a superintendent or manager, and then claim that the employee was not entitled to a service letter because the request was made to such officer instead of to an officer called a superintendent or manager. And defendant in this case does not go to that extreme in its contention, but it contends that it did have a person designated as "general superintendent," and a person designated as "superintendent," and that the request should have been made to one of them instead of to Mr. Perry, who was designated by it as "stationmaster." But the fact that Mr. Mathewson was designated as general superintendent or that Mr. Davis was designated as superintendent would in no manner argue that some other officer of the corporation, in this case Mr. Perry, did not have supervising control or management over the ushers and redcaps in defendant's employ. Statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion. There is no evidence whatever as to what duties were imposed upon the general superintendent or the superintendent, or whether they had any supervision or management whatsoever over the ushers or redcaps. The evidence was that Mr. Perry had "supervision over the redcaps; issued the orders, hired and fired them, and fixed the hours of work; if he didn't give the orders directly he did it through the chief usher." Under such circumstances we think Mr. Perry clearly came within the legislative meaning of superintendent or manager as to the ushers or redcaps.

It is significant that the Legislature did not restrict the person who should issue the letter to the superintendent. The words used are "superintendent or manager," either one, or, as we construe the statute, the officer whose duties correspond to those usually performed by a superintendent or manager as to the employee who is requesting a service letter.

We think the Kansas City Court of Appeals ruled correctly in the case of Soule v. St. Joseph Railway, Light, Heat & Power Co., 274 S. W. 517, and the later case of Lyons v. St. Joseph Belt Ry. Co., 84 S. W. (2d) 933, in holding that the section makes no specific re-

quirement regarding the person of whom the request shall be made for a letter, but merely specifies an officer or officers of the corporation whose duty it shall be to issue the same.

It is also significant that this defendant did belatedly and after this suit was filed, to-wit, on June 21, 1940, issue a service letter to this discharged employee, which letter was signed by J. M. Perry, Stationmaster, as well as by J. A. Mathewson, General Superintendent.

Appellant makes no point that the instructions are not in proper form but does contend that they are erroneous because there is no evidence tending to show either actual or legal malice, consequently the question of punitive damages should not have been submitted to the jury.

While in this case there was no proof on plaintiff's behalf which would justify the recovery of substantial compensatory damages, it is the settled law of this State and elsewhere that punitive damages may be assessed though the recovery of actual damages be only nominal. [State ex rel. v. Shain, 108 S. W. (2d) 351, l. c. 356, and authorities therein cited.]

A malicious act is a wrongful act intentionally done without cause or excuse. Malice is a condition of mind that cannot be seen with the eye, and where it is charged to exist some latitude is to be given the party charging it to show such words or acts of the party charged with having malice from which the jury may find or may fairly and reasonably draw the inference of its existence. If the proof be sufficient the jury may affirmatively find that there was a wrongful · act intentionally done without cause or excuse, and that there was actual malice, or the facts may be such that the jury may fairly and reasonably draw the inference of malice from a wrongful act, and this would be legal malice.

We think there was ample evidence from which the jury could find that respondent's discharge and the subsequent failure to issue to him a service letter was brought about because of his activities in the labor union affiliations of the ushers or redcaps, which had incensed the officers of defendant. When the request was made in writing to Mr. Perry for the service letter, respondent's evidence is that Perry read the letter, which requested a service letter, and "turned around and beat the desk with his fist, and said, 'I haven't anything to say now or any time; I'll talk to your representative, but I have nothing to say to you.'" And later when respondent went to Mr. Mathewson to ascertain why he was discharged, Mr. Mathewson told him, "We are not saying whether you was the trouble maker or not, but what you was fired for was your statement what you was going to do for the union, that you was going to do this and that, and a lot of other things, and you were going to get the boys all a large sum of money in back pay for the services they had rendered, and when you got this you would quit and go to your other job;", and

then after an appeal by respondent for another chance, he was told, "We won't give you a chance at anything," and Mr. Wicks jumped up and said, "If you cause any trouble over this we will see that you are fired off of that other job and you wouldn't want to lose a good job over this lousy one." From these facts in connection with all of the evidence as to respondent's union activities the jury could well find that there was ill will and malice in the minds of defendant's officers, and that it was manifested in respondent's discharge and the refusal to issue to him a service letter. Indeed defendant's counsel in argument to the jury stated, "in view of the malice and the hatred shown by the plaintiff in this case towards the Terminal Railroad while he was on the witness stand, you must reach the conclusion, at least, that the malice is not all on one side."

It was for the jury to determine from the attitude and words and acts of defendant's officers whether they held malice towards respondent which manifested itself in their failure to give him a service letter when it was requested. If the refusal of the service letter was actuated by malice the result would be the same whether the jury believed that the facts showed actual or express malice, or whether they showed implied or legal malice. The facts were sufficient for the jury to find malice from either or both viewpoints, and the instructions properly submitted both theories to the jury.

We would not be justified in holding that the verdict of $3,000.00 for punitive damages is so grossly excessive as to indicate improper motive on the part of the jury; especially is this true in view of the ruling of the Supreme Court in the case of State ex rel. v. Shain, supra, where in a suit under this same statute a judgment for $1.00 actual damages and $4,000.00 punitive damages was approved.

We find nothing in the record to substantiate appellant's last assignment and point that respondent's counsel in his argument contrasted appellant's and respondent's wealth, its corporate being against his natural being, its wealth against his poverty. The argument made no reference whatsoever to respondent's poverty. Respondent's counsel had a right to refer to the defendant's financial condition in the argument as bearing on the amount of punitive damages, if any.

The judgment of the trial court should be affirmed. It is so ordered. *McCullen* and *Anderson, JJ.*, concur.