245 S.W.2d 460 (1951)
DAVENPORT
v.
MIDLAND BLDG. CO.
No. 21601.
Kansas City Court of Appeals, Missouri.
December 3, 1951.
*461 Hershel H. Goodman, and Hanna, Hurwitz, Goodman, Stone & Taxman, all of Kansas City, for appellant.
Stanley Garrity, W. H. Sanders, and Caldwell, Downing, Noble & Garrity, all of Kansas City, for respondent.
CAVE, Judge.
This is a suit for damages for the alleged failure of defendant (appellant), as a corporate employer, to furnish a service letter of dismissal truly stating the reason for plaintiff's discharge. The jury returned a verdict for plaintiff in the sum of $2,500 for actual damages and $5,000 punitive damages, and judgment was entered accordingly. A motion for new trial was filed and the court ordered a remittitur of $2,499 of actual damages as a condition of overruling said motion. Plaintiff made such remittitur and judgment was entered for $5,001, actual and punitive damages. From this judgment the defendant appealed.
Plaintiff bases his right to recover on R.S.1949, § 290.140, V.A.M.S. That statute requires that a service letter contain certain information, and plaintiff charges that the letter furnished him did not comply with the statute in this one particular: that it did not truly state for what cause the plaintiff quit his service.
Because of the issues raised on this appeal, we think it is advisable to copy the letter in full.
"Receipt of your request of January 5, 1948 addressed to Midland Building Company for a service letter in connection with the separation of your employment at the Railway Exchange Building is hereby acknowledged.
*462 "The nature and character of your services were that of maintenance engineer and building superintendent. As maintenance engineer, you made various repairs, alterations and changes incident to the operation of the elevators, and other machinery and equipment in the building, as well as aided in keeping the same in proper condition and repair. You also did other general repair and alteration work in connection with the operation of the Railway Exchange Building. As building superintendent, you were in charge of and supervised all maintenance, janitor, elevator, and other employees, excepting office and administrative employees.
"The duration of your employment in both capacities, was from 1910 to 1925, and then after an absence of a few years, you returned to the employment in 1934 and continued to about June of 1947, at which latter date, you were relieved of your duties as maintenance engineer, and your employment was confined solely to that of building superintendent. On January 2, 1948 your employment was completely terminated.
"The cause for termination of your employment is as follows:
"In December of 1946, Yarco Realty Company, which has been employed as building manager by the owners of the property, moved its offices to the Railway Exchange Building. Since that time, it has fully familiarized itself with the detailed operations of the building.
"In the interest of economy and curtailment of operating expense, the building management has decided to do away with the position of building superintendent and to have the building management handle the supervision of employees instead and in lieu of building superintendent, which work was formerly performed by you.
"It is our pleasure to further state that you have always been a loyal, trustworthy, honest and efficient employee and we recommend you in the highest possible terms to any employment for which you might be an applicant."
Defendant contends that its motion for a directed verdict, at the close of all the evidence, should have been sustained because there is no substantial evidence that the service letter did not truly state the reason for plaintiff's discharge. This requires an examination of the evidence in the light most favorable to the plaintiff.
Defendant, a Missouri corporation, owns and operates the Railway Exchange Building, which is one of the largest downtown office buildings in Kansas City. Plaintiff was first employed by defendant in 1910 as a maintenance engineer, caring for the boilers and machinery of the building. He remained with the company until 1925, at which time he moved to a farm. About 1934 he returned to the employment of defendant and, according to plaintiff's testimony, he was assigned the position of building superintendent, his duties being to supervise the work of the other employees and to see that the building was kept clean and its equipment and machinery kept in repair, and that he was no longer maintenance engineer. He remained with the defendant until his discharge on January 2, 1948.
Defendant contends, and its evidence tends to support the proposition, that plaintiff was employed, prior to 1947, in a dual capacity: as building superintendent and maintenance engineer. This becomes important because of the evidence we now consider. In the early part of 1946, all of the corporate stock of defendant was purchased by one Shmikler, who became president of the company, and one Bisno, who became secretary, The new owners employed Yarco Realty Company, a partnership composed of N. Yarmo and Harry Cohn, as manager of the building. In the fall of 1946 certain employees of the defendant organized a union and affiliated with A.F. of L. and defendant entered into a contract with the union which required all employees, except office help and supervisors, to be members of the union. Sometime thereafter, as a result of complaints made by the union representative, the defendant, through Mr. Cohn, urged plaintiff to join the union, which he declined to do because he felt that he was serving in a supervisory capacity and did not need to join. There were several conversations between plaintiff and the representatives of defendant *463 concerning the advisability of his joining the union, or that he cease doing maintenance work which was required by the union contract to be done by union labor. Those conferences extended over a period of more than a year before plaintiff was discharged. Plaintiff denied doing any maintenance work but admitted that when Mr. Cohn urged him to confine his activities to that of building superintendent, "I told him that I just assisted a little and he said, `Don't do that, just don't do anything;' * * * and I said, `Sometimes I get so darn itchy to help, those fellews would make such a dauble of it."
On October 8, 1947, a representative of the union wrote Cohn complaining that plaintiff was continuing to do maintenance work in violation of the union contract, and that unless such work ceased within five days the union would "have to take whatever action that is necessary."
Immediately thereafter Cohn called plaintiff to his office and "He told me he was going to fire me, I put him in a crack with that union. * * * He said, `You either join the union or I am going to fire you.' I said, "Go ahead and fire me, I am not going to join.' He says, "I don't want to do that. * * * I want you to talk to my lawyer.'" Plaintiff did talk to defendant's attorney who told him, "That is all a mess out there, it will cost about $400.00 to get it straightened out." "He says, "I tell you what I will do, you join the union, I will pay your initiation fees and your dues.' * * *
"Q. Did you still take the position that a superintendent had no place in the union? A. I told him I would talk to my lawyer about it. * * *
"Q. Did you still stick to your position the same day the demand was made on you to join the union? Were you fired January 2d? A. Yes. They didn't say that on January 2d, (about joining the union) they said that before then.
"Q. On January 2d were you in Mr. Cohn's office? A. Yes.
"Q. While in his office did he state that then (about joining the union) about firing you? A. He said, `I am going to have to let you go, Davenport.'
"Q. Did he state the reason then? A. I believe he said, `I don't like to do this.'
"Q. Did he state his reason for firing you? A. Yes.
"Q. Was anything said about curtailing operations? A. No.
"Q. Was anything ever said about cutting down the number of employees? A. Never was. * * *
"Q. Did he say why he was going to let you go? A. Because I didn't join the union. * * *
"Q. Is that the reason he gave for letting you go? A. Yes."
Concerning what occurred on the day he was discharged, plaintiff testified:
"A. Mr. Cohn called me to his office on the 2d day of January, 1948, and said, `Mr. Davenport, * * * I am going to have to let you go.' * * * A. When he handed me my check and told me I was fired, I asked him for a service letter. He said, `Oh, I don't have to give you a service letter.'
"Q. Did he say it in an angry tone of voice? A. Yes.
"Q. Did he consult with his lawyer? A. I said, `Oh, yes, you do.' He reached over and called Mr. Goodman (his attorney). He said, `Davenport is in my office and wants a service letter.' Of course I couldn't hear what Goodman said. He said, `All right, I will give you a letter tomorrow.' So I thanked him, got up and went out of the office."
The request for a service letter at that time was made orally, although the statute requires such request to be made in writing. However, defendant did furnish plaintiff a letter the next day after the oral request, which gave the same reason for his discharge as that set out in the letter copied, supra. Immediately after receiving this letter plaintiff consulted his lawyer who, on January 5, prepared a letter signed by plaintiff, stating that the letter of January 3rd was unsatisfactory and requesting a service letter setting forth the nature, character and duration of plaintiff's service and truly stating for what cause his employment was terminated. In response to this written request, the defendant prepared and delivered the letter sued on.
*464 Mr. Cohn testified that, at the time plaintiff first requested a service letter, he had no knowledge of such a statutory requirement, but that when he consulted his attorney he immediately prepared the letter of January 3rd and, when he received plaintiff's request for a proper service letter, he collaborated with his attorney in an effort to furnish such a letter. Throughout his testimony he insisted that plaintiff was discharged because the position of building superintendent was abolished and that he, as manager, took over those duties. However, on cross-examination, he was asked:
"Q. Did the trouble with the union have anything to do with the discharge of Mr. Davenport? A. I think partially.
"Q. This letter doesn't mention the union? A. No. * * *
"Q. In that respect that letter left out at least part of the reason Mr. Davenport was discharged? A. I think the letter is pretty clear if he was a union member he could have worked in the building.
"Q. Your letter doesn't say that. A. No, the letter doesn't bear that out.'" Cohn denied that he ever ordered plaintiff to join the union, but admitted that he had received complaints from the union about plaintiff's doing certain maintenance work for more than a year before he was discharged, and had ordered plaintiff to discontinue doing work which violated the union contract.
The record discloses that within a few days after plaintiff was discharged, a Mr. Jones was employed, thus restoring the same number of employees. The evidence is conflicting whether a Mr. Clark, one of defendant's other employees, was promoted to building superintendent and performed the same duties that were performed by plaintiff, or merely acted as maintenance engineer and assistant manager.
We are of the opinion that, when the evidence is viewed in the light most favorable to the plaintiff, it is sufficient to raise the issue whether the service letter truly stated the reason for plaintiff's discharge. Therefore, the court did not err in overruling defendant's motion for a directed verdict at the close of all the evidence.
Defendant next contends that the court erred in submitting the issue of punitive damages because there was no substantial evidence of actual malice or legal malice.
Plaintiff's instruction No. 2 submits both issues, and reads:
"You are further instructed that in law there are two kinds of maliceactual malice and legal malice. By actual malice is meant actual spite and ill-will; by legal malice is meant the intentional doing of a wrongful act without just cause or excuse.
"And you are also instructed that in law there are two kinds of damagesactual damages and punitive damages. Actual damages are for the purpose of compensating for the actual pecuniary loss or damage, if any, done to a plaintiff by reason of a wrongful act. Punitive damages are for the purpose of punishing a defendant and making an example of a defendant for a wrongful act maliciously done as malice is defined in these instructions."
Cases defining malice are legion, but the generally accepted definition is that legal malice exists where a wrongful act is intentionally done without just cause or excuse. Lampert v. Judge & Dolph Drug Co., 238 Mo. 409, 418, 141 S.W. 1095; State ex rel. United Factories v. Hostetter, 344 Mo. 386, 391, 126 S.W.2d 1173; 54 C.J.S., Malice, pp. 915-918. Actual or express malice, exists when one with a sedate, deliberate mind and formed design injures another, as where the person is actuated by spite and ill will in what he does and says, with a design willfully or wantonly to injure another. 54 C.J.S., Malice, pp. 915-918. Missouri courts uniformly recognize the distinction between legal and actual malice. State ex rel. v. Hostetter, supra; Hatton v. Carder Wholesale Grocery Co., 235 Mo.App. 1198, 150 S.W.2d 1096; Van Sickle v. Katz Drug Co., 235 Mo.App. 952, 151 S.W.2d 489. Legal malice may exist with actual malice or it may exist quite independently of it. 54 C.J.S., Malice, p. 915; Boyles v. Burnett, 213 Mo.App. 288, 249 S.W. 719, 722; Boehm v. Western Leather Clothing Co., Mo.App., 161 S.W.2d 710, 717.
*465 It is settled law in this state that proof of legal malice alone will support a judgment for punitive damages. See authorities, supra.
With these general principles in mind, we discuss the question whether the court erred in submitting legal malice and actual malice.
Without again reviewing the evidence, we think it is sufficient from which the jury could find that the defendant intentionally, and without just cause or excuse, failed to give the true reason for plaintiff's discharge. Bourne v. Pratt & Whitney Aircraft Corp., Mo.App. 207 S.W.2d 533, 542. Thus there was no error in submitting the issue of legal malice.
However, this does not dispose of the question whether the court erred in submitting actual malice, as defined in plaintiff's instruction No. 2, and by the authorities, supra.
In addition to the evidence already outlined, we note that plaintiff testified:
"Q. * * * after June * * * 1946 when there was a change in the ownership of the stockholders and Mr. Cohn became the manager of the building your relationships with him were always pleasant and friendly? A. They were."
Mr. Cohn testified concerning plaintiff's discharge:
"Q. Now, did you discharge Mr. Davenport? A. Yes, sir.
"Q. Did you have a conversation with him at the time of the discharge? A. I told him I liked him as a man, would like to keep him on but I couldn't continue to pay him for walking around doing the work that I was hired to do. * * *
"Q. Did you have any cross or harsh words with him? A. No, I never had any harsh words with anyone."
Plaintiff contends that actual malice was evidenced by "(a) the anger of the employer when a service letter was requested; (b) the refusal, at first, of the employer to give a service letter; and (c) the disagreement of long standing of the union matter."
The only direct evidence of Cohn's anger occurred when plaintiff asked him for a service letter after he was discharged, and Cohn replied: "Oh, I don't have to give you a service letter. Q. Did he say it in an angry tone of voice? A. Yes." At most, that is a mere conclusion on plaintiff's part. There were no harsh or abusive words used or any accusation of improper conduct against the plaintiff, such as are found in many of the cases cited in plaintiff's brief. Furthermore, since the statute was amended in 1941, p. 330, the defendant was not required to give a service letter until requested to do so "in writing." Thus Cohn was legally correct in stating that he was not required to give a service letter on oral request. However, when he was advised by his attorney that such a letter should be given he did not stand on technical grounds but immediately furnished plaintiff a letter. The first letter was not satisfactory to plaintiff and he requested, in writing, another letter, which was promptly furnished, and which is the one sued on. It certainly complies with the statute in all respects, except the one controverted issue, whether it states the true reason for the discharge. Thus there was no such delay in issuing the letter which would indicate that the defendant issued it reluctantly or in a spirit of spite and ill-will. The controversy between plaintiff and Cohn concerning the advisability and the necessity of plaintiff's joining the union does not indicate any ill-will, hatred or spitefulness on the part of Cohn. The record discloses that during the time those conversations were taking place, Cohn increased plaintiff's salary $25 a month, and had offered to pay his initiation fee and dues in the union. He was attempting to persuade plaintiff to cease doing maintenance work in violation of the union contract or join the union so that he could continue to do such work. The purpose of those discussions was to retain plaintiff as an employee, not to be rid of him. Plaintiff testified that on the day he was discharged Cohn told him, "I am going to have to let you go, Davenport. I don't like to do this."
In deciding whether the evidence shows actual malice, we must consider the contents of the letter as well as all facts and circumstances *466 surrounding its issuance. Certainly the letter is most complimentary of plaintiff. It could not possibly hinder him in securing another position. It goes far toward dispelling any thought of actual malice.
When all the evidence is considered in the light most favorable to the plaintiff, we are forced to the conclusion that there is no substantial evidence to support the submission of actual malice. Hatton v. Carder Wholesale Grocery Co., supra; Van Sickle v. Katz Drug Company, supra; Bourne v. Pratt & Whitney Aircraft Corp., supra.
Plaintiff relies on Gerharter v. Mitchellhill Seed Co., Mo.App., 157 S.W.2d 557; Ackerman v. Thompson, Trustee, 356 Mo. 558, 202 S.W.2d 795; Chrisman v. Terminal R. Ass'n of St. Louis, 237 Mo.App. 181, 157 S.W.2d 230; Lyons v. St. Joseph Belt R. Co., 232 Mo.App. 575, 84 S.W.2d 933; Walker v. St. Joseph Belt Ry. Co., Mo.App., 102 S.W.2d 718. A careful reading of those cases will distinguish them on the facts. For example, in the Ackerman case, the employer had refused to give the employee a service letter of any kind. In the Gerharter case [157 S.W.2d 581] the evidence disclosed that there had been much bitter controversy concerning a shortage in accounts, and when the employer's manager delivered the purported service letter to the employee, he stated: "`You are no damn good,' and that he could prove it." In the Chrisman case [237 Mo.App. 181, 157 S.W.2d 235] the letter was not furnished until 17 months after the discharge, and when the employer asked for "another chance" his superiors replied, "`We won't give you a chance at anything,' * * * `If you cause any trouble over this we will see that you are fired off of that other job and you wouldn't want to lose a good job over this lousy one'." There was other evidence of ill feeling. In the other cases relied on by plaintiff there was evidence of ill feeling and bitterness on the part of the employer. We do not find any evidence to indicate such an attitude in the instant case.
Defendant insists that the verdict for punitive damages is grossly excessive and, while we think it is large, it is unnecessary for us to pass on this assignment for the reason that on another trial of the case the matter may not arise as no one can foretell what the recovery for punitive damages, if any, will be. Davis v. F. M. Stamper Co., 347 Mo. 761, 148 S.W.2d 765, 772.
In view of the fact that this case may be retried, we make the observation that plaintiff's instruction No. 2 is an abstract definition of malice, and there was no instruction setting out the facts necessary to be found in order to assess punitive damages. Plaintiff says that the instruction in its present form was approved by this court in Lyons v. St. Joseph Belt Ry. Co., supra, 84 S.W.2d at page 944. However, a careful reading of that case will show that the instruction was approved when read in connection with other instructions setting out the necessary facts to be found.
For the error assigned, the judgment is reversed and the cause remanded.
All concur.
On Motion for Rehearing In his motion for rehearing plaintiff (respondent) now contends that the issue of actual malice was not submitted by the instructions, although in his brief and oral argument in this court he conceded that issue was submitted, and devoted many pages of his brief to justify such submission. Our original opinion was written on the basis that the issue of actual malice was submitted and that the only point of argument was whether the evidence justified the submission of such issue.
Plaintiff now contends that our original opinion held that his instruction No. 2 was a verdict submission instruction. We did not so hold. We discussed the evidence of actual malice as though that issue had been submitted. It was evident that the case was tried on that theory in the lower court and so submitted here.
Plaintiff's principal instruction directed a verdict for plaintiff for actual damages if the jury should find "that defendant failed and neglected to issue to plaintiff a letter truly stating the cause of plaintiff's discharge from the services of defendant *467 but on the contrary falsely stating the cause of plaintiff's discharge, * * *" and concluded by directing a verdict for plaintiff for punitive damages "in accordance with other instructions herein given." Instruction No. 2 (plaintiff's only other instruction) denned actual malice, and concluded with this direction: "Punitive damages are for the purpose of punishing a defendant and making an example of a defendant for a wrongful act maliciously done as malice is defined in these instructions." Defendant's instruction No. 7 told the jury that before a verdict for punitive damages could be returned in favor of the plaintiff, the jury must find, among other facts, "that the defendant intentionally and maliciously assigned a false reason for discharging Mr. Davenport, * * *." It clearly appears from these instructions that, at least, an attempt was made to submit the issue of actual malice.
Even if it be conceded that plaintiff's instruction No. 2, standing alone, is an abstract statement of law and does not direct a verdict, nevertheless, under the circumstances of this case, it is erroneous because, when considered with other instructions, it is confusing, misleading and prejudicial.
The applicable rule is that, "While instructions containing mere abstract statements of law should not be given, the giving of such an instruction is not reversible error on appeal, unless it appears from the circumstances of the case that the instruction was confusing, misleading and prejudicial in the particular case." Benham v. McCoy, Mo.Sup, 213 S.W.2d 914, 920. See, also, Cason v. Kansas City Terminal R. R. Co., Mo.Sup, 123 S.W.2d 133, 139; De Moulin v. Roetheli, 354 Mo. 425, 189 S.W.2d 562, 567. We think instruction No. 2, when considered with other instructions, was certainly confusing, misleading and prejudicial.
The motion for rehearing or, to transfer to the Supreme Court, is overruled.
All concur.